2020 IL App (1st) 191410-U
Order filed April 24, 2020

FIFTH DIVISION

Nos. 1-19-1410 & 1-19-1801 (cons.)

NOTICE: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* A.G., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| (People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 15 JA 1328 |
| v. | ) | |
| | ) | |
| Jorge G., | ) | Honorable |
| | ) | Patrick T. Murphy, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Hoffman and Justice Delort concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm the decisions of the circuit court finding the father was unfit to parent his minor daughter and terminating his parental rights where the minor had been subjected to medical abuse while in his and the mother's care after rejecting his contentions that the circuit court improperly denied a host of motions and pleadings, the circuit court lacked jurisdiction to enter the adjudication order, the finding that

he was unfit was against the manifest weight of the evidence, and various violations of the constitution and law occurred during the case.

¶ 2    Jorge G.(the father), respondent-appellant, appeals from orders denying certain motions and pleadings and finding him unfit to parent his minor daughter, A.G. (the minor), born on February 11, 2011, and terminating his parental rights. We affirm.[1]

¶ 3                                I. BACKGROUND

¶ 4    On November 24, 2015, Lurie Children's Hospital (Lurie) called the Department of Children and Family Services (DCFS) hotline after discovering that A.G., at the age of four, had over 300 medical encounters at several different hospitals. Nicole G. (the mother), A.G.'s mother,[2] had reported to medical personnel that A.G. suffered symptoms relating to various physiologic systems including: neurology (*e.g.*, seizures, tremors, and trouble walking); gastroenterology (*e.g.*, vomiting, diarrhea, feeding difficulties, constipation, bloody stools, failure to thrive, obesity, and food allergies); pulmonology (*e.g.*, snoring and disrupted sleep); allergies/immunology (*e.g.*, seizures with vaccines and food allergies); developmental (*e.g.*, delayed speech and possible autism); ear nose, and throat (*e.g.*, recurrent ear infections, sinus problems, and enlarged adenoids and tonsils); psychiatry (*e.g.*, disruptive behavior and ADHD symptoms); and dermatology (*e.g.*, rash, eczema, dry skin, and excessive sweating).

¶ 5    At that time, the father and the mother were married and lived together in a home with A.G. On December 30, 2015, when A.G. was removed from the home, the mother provided DCFS

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order stating with specificity why no substantial question is presented.

[2] The mother filed an appeal (Case No. 1-19-1667) from the orders finding A.G. was neglected and terminating her parental rights. The mother's attorney filed a motion to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967). On February 7, 2020, we granted that motion and affirmed the orders as to the mother.

with several medical devices (a helmet, leg braces, a wheelchair, a walker, and a breathing machine) and a "luggage full" of medications for A.G. A.G. also had a gastrostomy tube (G-tube).

¶ 6     On December 31, 2015, the father was present in court and the court appointed him counsel. The State filed a petition to adjudicate A.G. a ward of the court and contended that A.G. was neglected or abused pursuant to sections 405/2-3(1)(b) [environment injurious] and 405/2-3(2)(ii) [substantial risk of physical injury] of the Juvenile Court Act (Act). 705 ILCS 505/2-3(1)(b); 2-3(2)(ii) (West 2016). The petition asserted that A.G.: "has been diagnosed with medical child abuse/Munchausen's Syndrome by Proxy" and had been subjected to unnecessary invasive and non-invasive procedures.

¶ 7     The circuit court conducted a hearing on the State's motion for temporary custody. The State introduced a November 24, 2015, letter from Dr. Sandeep Narang, the head of Lurie's child abuse pediatrics division, with his conclusion that immediate protective action was necessary as there was a high probability of medical child abuse (Munchausen Syndrome by Proxy)[3], and a high risk that A.G. would be subjected to further unnecessary medical treatment. The circuit court found that probable cause existed that A.G. was abused/neglected and that there was an immediate and urgent necessity supporting her removal from the home[4]. The court placed A.G. in the guardianship of DCFS and appointed the Cook County Public Guardian as her guardian *ad litem* (GAL). The mother and the father were denied visitations to allow A.G. the opportunity to be medically observed without the influence of her parents.

---

[3] According to the medical evidence in this case, Munchausen Syndrome is now known as Factitious Disorder, and we will use that term from this point.

[4] On January 29, 2016, after a full evidentiary hearing, a similar temporary custody order was entered.

¶ 8 As recommended by Dr. Narang, after her removal from the home, A.G. was hospitalized at Lurie for an objective assessment of her medical needs and was found to be healthy. When she was released from Lurie, in January 2016, A.G. was placed in the foster home of Lisa B. and Sean K. (the foster parents) where she has remained.

¶ 9 According to the DCFS initial client service plan dated February 10, 2016 and integrated assessment report (assessment report) dated March 14, 2016, in February, the father had been arrested and placed in custody for domestic battery not involving the mother. During the assessment, the father revealed that his father had been physically abusive to him and his mother. The father has three additional children from prior relationships and there were incidents of aggression in those relationships. The father has a history of arrests, depression, and gang involvement. As a result of "street fights," he has suffered head injuries and has received gunshot and stabbing wounds. The father stated that he was not A.G.'s primary caretaker and had "sporadic at best" involvement with her medical treatments. The father disciplined A.G. by yelling or screaming at her.

¶ 10 The assessment report included a concern that the father's ability to parent A.G. was "hindered due to the inconsistent level of interactions and care he has provided [A.G.] throughout her life." Further, the father has "rigid and persistent beliefs that what he is doing is right and that [A.G.'s] medical interventions were needed." The assessment report concluded that A.G.'s safety and well-being required that the father undergo intervention to discontinue his maladaptive behavior. Thus, the following actions were recommended for the father: individual psychotherapy, services for interpersonal violence in the home, random toxicology testing, substance abuse treatment; group parenting classes, completion of high school education, and stable housing and

employment. The prognosis for the father achieving reunification with A.G. was "guarded" based on his "difficulties with emotional regulation, poor parenting approach, and physical aggression."

¶ 11    The June 15, 2016 service plan stated that the father had been referred to services, but was refusing to enroll. Additionally, his referral to a Children's Home & Aid (CHA) therapist was closed because the father insisted that the session be recorded, which was against the agency's policy.

¶ 12    The court held an adjudication hearing over several dates beginning on November 17, 2016 and ending on December 21, 2016.

¶ 13    Coty Corcoles, a DCFS investigator, testified that on November 25, 2015, after the hot line call, she visited the family's home. The father was hostile, angry, and noncooperative. The mother described A.G.'s various medical needs in ways that were often contradictory. A.G. needed a breathing machine for sleep apnea, a wheelchair because of an inability to walk long distances, a helmet because she jumps from place to place, and braces because she could not walk normally. The mother explained that A.G. was diagnosed with obesity, but had a G-tube because she would not eat. Based on her full investigation, Ms. Corcoles concluded that A.G. should be placed in protective custody.

¶ 14    Dr. Narang testified that in November 2015, after A.G.'s child psychiatrist expressed concern that A.G. was being medically abused, he reviewed A.G.'s records from Lurie, other hospitals, and her school. Additionally, Dr. Narang spoke with multiple doctors who had treated A.G.; they believed that, at a minimum, the mother had either exaggerated A.G.'s symptoms or had not given accurate information.

¶ 15    Dr. Narang detailed A.G.'s extensive medical history, which began when she was only two weeks old. Over time, the mother reported to hospital personnel that A.G. suffered from numerous ailments, including those we described above and had a variety of medical devices.

¶ 16    Additionally, over her first four years, A.G. underwent many medical procedures, including: tonsillectomy and adenoidectomy surgeries, injections, multiple sleep studies, an EEG, pulmonary function tests, blood draws, barium enemas, barium studies, plain films of her abdomen, X-rays, and a rectal biopsy. A.G. had been prescribed medications, including medicines to prevent seizures and to treat constipation, ADHD, and hyperactivity. In November 2015, A.G. underwent physical and occupational therapy based on the mother's reports of a developmental delay, toe walking, and generalized fatigue.

¶ 17    Based on Dr. Narang's recommendation, A.G. was evaluated during her stay at Lurie's. A.G. told Dr. Narang that she only used her medical equipment when she was outside the home or a guest was at the home. Over the course of her hospitalization, A.G. did not present with any of the symptoms, or suffer from any of the disorders, which had been reported by the mother. Overall, A.G. was found to be healthy and normal; she did not need her medical equipment, G-tube or medications.

¶ 18    Dr. Narang diagnosed A.G. with Factitious Disorder by Proxy, which involves unnecessary medical interventions or procedures performed at the behest of the child's caregiver who either exaggerates or fabricates the symptoms of the child. Dr. Narang opined that A.G. had suffered medical child abuse and she would be at risk if she remained with the mother and the father. He reached these conclusions within a reasonable degree of medical certainty.

¶ 19    The mother testified to A.G.'s multiple health issues and medical treatments. On cross-examination by the father, the mother denied that the father abused her. The mother had been

6

A.G.'s primary caretaker. Although, the father missed many of A.G.s hospital visits, the mother showed him the paperwork from A.G.'s medical appointments.

¶ 20    The State published a portion of the mother's service records, which stated that she had "reported spouse had threatened to harm her and frequently insults [her]." The father declined to testify.

¶ 21    After orally finding that the State had established that A.G. had been abused and neglected, the court proceeded to a disposition hearing.

¶ 22    Brook Sloan, a caseworker from CHA, testified that, at that time, A.G. was six and without developmental issues, medical needs, or concerns. Her foster home was safe. At school she shows intelligence, participates in class discussions, and interacts with her classmates.

¶ 23    As to the father's required services, Ms. Sloan testified that the father had undergone a psychological evaluation with Dr. Valerie Bouchard, but the results were not yet available. Ms. Sloan considered the father as uncooperative. He had not engaged in individual therapy, domestic violence treatment, parenting classes, or random toxicology screens. The father did not attend the initial meeting with the assigned therapist because he was not permitted to record it. The father was prohibited from visits with A.G. until CHA had the results of his psychological evaluation and the father began individual therapy. In the meantime, the father had only once inquired about A.G.'s well-being and had not expressed a wish for reunification.

¶ 24    The December 1, 2016 service plan was admitted into evidence during Ms. Sloan's direct testimony. That plan reported that the father refused to participate in the required services as he believed them to be  unnecessary in that he "did not take [A.G.] to her medical appointments."

¶ 25    On cross-examination by the father, Ms. Sloan testified that A.G. told Ms. Sloan that there were domestic violence issues between the father and the mother. The mother had been referred to and attended services for victims of domestic violence.

¶ 26    At the conclusion of the disposition hearing, the father asked that the court find only that he was unable but not unwilling or unfit to parent A.G.

¶ 27    The court, on December 21, 2016, entered an adjudication order finding A.G. had been neglected in that she had been subjected to an injurious environment and abused for being subjected to a substantial risk of physical injury. The court found Dr. Narang credible and that his Factitious Disorder diagnosis was not contradicted. In its disposition order, the circuit court found that the father was unable for some reason other than financial circumstances alone to care for, protect, train, or discipline A. G. and that services meant to preserve the family had been unsuccessful. The court informed the father that he had 30 days to appeal the adjudication and disposition orders and his failure to do so would result in the "appellate court losing jurisdiction over this matter."

¶ 28    After the hearing, in a first permanency order, the circuit court found the father's recommended services were "appropriate and reasonably calculated to facilitate achievement of the permanency goal" and the father had made some progress but was not in services and set a goal that A.G. return home within 12 months. The court orally warned the father that a failure to comply with services could result in the termination of his parental rights.

¶ 29    On April 3, 2017, CHA filed a written report with the court, which included details as to the father's status and progress. Based on her psychological evaluation, Dr. Bouchard diagnosed the father with narcissistic personality disorder, adjustment disorder with mixed anxiety and depression mood, parent-child relational and employment problems. She recommended individual

therapy, parenting classes, random urine drops, and a domestic violence assessment. In December 2016, the father began individual therapy with Timothy Hughes, a therapist chosen by the father. The father missed his sessions in February. When he had attended sessions, the father was guarded and showed signs of depression. Mr. Hughes recommended that the father attend anger management treatment. The father refused to undergo random toxicology testing because according to him, his drug testing for his employment had been negative. CHA was concerned that despite not seeing A.G. for 15 months, he was not willing to take the necessary steps to achieve visitation.

¶ 30     On that date, the court again admonished the father to comply with all service recommendations and informed him that the failure to do so could result in the termination of his parental rights.

¶ 31     The June 6, 2017 service plan explained that the father had not seen A.G. since December 2015 because DCFS had not received an opinion as to the appropriateness of visits. The caseworker was unable to confirm the father's attendance at individual therapy with Mr. Hughes since March 2017. The father had not completed a domestic violence assessment, parenting classes, or anger management classes. At that time, the father had completed only one of four requested toxicology tests.

¶ 32     However, on June 21, 2017, the circuit court granted the father supervised day visits with A.G. The visitation order required the father to engage in services in order to accept and understand his role and responsibilities for A.G.'s removal from the home and to achieve reunification. A similar visitation order was entered on September 13, 2017.

¶ 33     The service plan dated November 29, 2017 reported that after Mr. Hughes had refused to provide progress reports to DCFS, the father was assigned to Clara Villasenor, for individual

therapy. However, in October 2017, the father, in a therapy session with Ms. Villasenor, became "verbally escalated and appeared angry" after voicing his distrust of the therapist and CHA. Ms. Villasenor felt unsafe around the father and therapy was terminated. [5] After the incident, the father was required to engage in dialectical behavior therapy (DBT). The plan stated that the father "continue[d] to display aggressive behavior." He had not enrolled in anger management classes.

¶ 34    On February 13, 2018, the father filed a petition for a rule to show cause why CHA, as the agent of DCFS, should not be held in contempt due to its alleged misconduct relating to the father's required services. In a written response to the petition, the GAL maintained that the father was seeking to blame the agencies for his failure to achieve progress towards reunification with A.G. and asked the circuit court to change the permanency goal to substitute care pending court determination of termination of parental rights. The response included a letter dated December 5, 2017 from Emily Reynosa, supervisor of Family Centered Services at CHA, to defendant's counsel. The letter detailed CHA's policy for visitations and scheduling of visitations and listed the father's outstanding services.

¶ 35    On May 9, 2018, the circuit court held a permanency hearing.

¶ 36    Taylor Homyk testified that she was the CHA caseworker for the family since October 2017. A.G.'s foster home remained safe and appropriate. A.G. did not have any diagnoses, special needs, or medications. She was in first grade and was doing well in school.

¶ 37    The father had not completed required services. Although the father attended five individual parenting sessions at his second referral, he had not been fully engaged and he refused requests to reenroll in parenting sessions and participate in group classes. The father was required

---

[5] After his termination from therapy with Ms. Villasenor, it appears defendant's counsel found a therapist, Latrice Oglesby, but Ms. Oglesby did not communicate with CHA/DCFS.

to undergo individual therapy in order to develop coping strategies to better parent A.G. and understand why his beliefs undermined his role as her caregiver and contributed to his aggressive behavior towards others. The father was now attending sessions every other week with Dr. Paul Linden, his "fifth attempt" at therapy. The father had not begun DBT, which had been recommended to assist the father with engaging in relationships in a positive manner and regulating his emotions. The father was now up to date with random drug drops, which had been negative.

¶ 38 The father was allowed supervised visits with A.G. for three hours per week. He often missed visits. When he did attend, he demonstrated a lack of engagement and nurturing and the visits lasted only one hour. Throughout visits, the father relied heavily on A.G. playing with his cell phone.

¶ 39 The father testified that he is divorcing the mother and now lives with his girlfriend, their 17-month-old daughter, and his girlfriend's son. If ordered by the court, he would prevent the mother from speaking with or seeing A.G. Additionally, he was willing to make medical appointments for A.G., abide by the doctors' instructions, and participate in recommended services.

¶ 40 On May 10, 2018, after considering the evidence and the statutory factors for determining a permanency goal (705 ILCS 405/2-28(2) (West 2016)), the court entered a written order with a finding that the goal of substitute care pending termination of parental rights was in the best interest of A.G. The court, in its written order, stated that A.G. entered the system "when she was almost 4 years old and after having suffered relentless, persistent and unremitting abuse." The circuit court believed that A.G. "was, in effect, tortured by the severe mental deficiencies of the mother and the inability or passivity on the part of the father." The court found that the mother and the father "had

11

been given every opportunity to resolve the issues [but] have not done so" and both blamed the child welfare system. The court also found the father had "not moved beyond a few hours per week of supervised visits," had been discharged from therapy due to his aggressive behavior, had not begun DBT, and had failed to complete parenting classes The circuit court found A.G. was doing exceedingly well and had bonded with her foster parents.

¶ 41    The June 11, 2018 service plan stated that the father's progress in services was unsatisfactory.

¶ 42    On November 29, 2018, the State filed a supplemental petition for the appointment of a guardian with the right to consent to adoption setting forth the basis of the parents' alleged unfitness under 750 ILCS 50/1 (West 2016) and 705 ILCS 405/2-29 (West 2016). The State claimed that the parents failed: (1) to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare (750 ILCS 50/1 D(b) and 705 ILCS 405/2-29); and (2) to make reasonable efforts to correct the conditions which were the basis for the removal of the child from them and/or have failed to make reasonable progress toward the return of the child to them within nine months after the adjudication of neglect or abuse under the Act, or after an adjudication of dependency under the Act, and/or within any nine-month period after said finding (750 ILCS 50/1 D(m)) and (705 ILCS 405/2-29).

¶ 43    On April 9, 2019, the court entered a permanency order which found that DCFS had made reasonable efforts in providing services to facilitate the father's achievement of the permanency goal and set the case for a termination hearing.

¶ 44    Thereafter, the father filed a variety of pleadings raising a host of issues including a supplemental petition to terminate wardship and guardianship, an amended and/or supplemental petition to vacate the various orders and terminate the wardship and guardianship, a motion to

exclude evidence, a motion to quash summons, and an amended motion to quash summons. On June 4, 2019, the circuit court denied the father's motions. However, the father's motion to dismiss the supplemental petition for termination of parental rights and a separate motion to terminate wardship and guardianship filed on December 20, 2018 remained pending. On July 3, 2019, the father filed a notice of appeal from the June 4, 2019, order (Case No. 1-19-1410).

¶ 45    On July 22, 2019, the father filed a motion for judgment as a matter of law and a motion to dismiss the supplemental petition for termination of parental rights.

¶ 46    The circuit court commenced a fitness hearing on July 23, 2019. Over the father's objection, the court stated the pending motion to dismiss would be considered with the hearing.

¶ 47    Additionally, the court took judicial notice of A.G.'s December 21, 2016 adjudication and dispositional orders and the permanency orders of December 21, 2016; September 13, 2017; and March 10, 2018. The State admitted into evidence the assessment report, six service plans, and reports from the father's service providers and case workers.

¶ 48    Dr. Mary Gardner, a clinical psychologist, testified for the State as an expert in clinical psychology and parenting capacity assessment. Dr. Gardner had prepared the parenting capacity assessment for the mother only. Dr. Gardner defined Factitious Disorder as one in which an individual falsely identifies themselves or a proxy, such as a child, to have excessive medical conditions which do not stand up to medical diagnosis or treatment. Dr. Gardner did not conduct a psychological evaluation of the mother or make the determination of Factitious Disorder. In her report, Dr. Gardner stated that the main risk posed by the mother if A.G. was returned home was uncertainty as to whether the mother, in fact, had Factitious Disorder due to the difficult nature of diagnosing the disease. However, Dr. Gardner testified that in this case, there was a determination of a high probability that the mother had the disorder. Further, even if the mother did not have

Factitious Disorder, she still posed a risk to A.G. based on the mother's second diagnosis of personality disorder, "a rigid, fixed, maladaptive way of relating to the world." According to Dr. Gardner, individuals with personality disorders often can be "identified by people in their immediate environment."

¶ 49    The State also called Dr. Linden, a licensed psychologist, as an expert in Factitious Disorder by Proxy.

¶ 50    From March 2018 through June 17, 2018, the father attended six sessions with Dr. Linden, which Dr. Linden considered "the initial phase" of therapy. Dr. Linden sought to establish a therapeutic alliance with the father and to decrease the tension between the father and DCFS/CHA. These goals were not met. Dr. Linden agreed with Dr. Bouchard's diagnosis that the father had an emotional adjustment disorder that was related to both depression and anxiety.

¶ 51    Dr. Linden explained to the father that his belief that he was not being treated fairly impeded his progress with services. In his April 23, 2018 report, Dr. Linden revealed that the father told Dr. Linden that he was "fairly disengaged" from the decision making as to A.G.'s health for which he had "some regret." The father "was willing to acknowledge [the mother] was overly anxious as a parent" but rejected any conclusion that she suffered from Factitious Disorder. Dr. Linden believed that although Factitious Disorder is difficult to diagnose, the father, at some point, had an obligation to recognize the mother's excessiveness. Dr. Linden terminated the father from his therapy services after he failed to attend a scheduled session in June 2018 and never rescheduled.

¶ 52    Ms. Reynoso has been involved with the family since January 2016. She testified to the history of the case. In December 2016, the agency was still recommending no contact between the father and A.G. because the father had not undergone a psychological evaluation or participated

in individual therapy. By the end of 2017, the father was allowed supervised visits but was not consistent in attending them. When he did visit, he was appropriate, but struggled to attend to A.G.'s needs. At that time, the father had made limited progress in terms of reunification services. Ms. Reynoso on multiple occasions relayed the outstanding services and the rationale behind those services to the father. Ms. Reynoso testified that the father did not need service providers with expertise in Factitious Disorder. In April 2018, DCFS recommended a goal of substitute care pending the court's termination of parental rights due to the father's lack of progress in services, the length of time that the case had been open, and the father's failure to attain unsupervised visitation.

¶ 53    Ms. Homyk, the current case worker for the family, testified that the father has not had contact with A.G. since a one-hour supervised visit on May 10, 2018. The agency contacted the father about scheduling more visits, without success. He has not sought to communicate with A.G. in any way since the last visit. The agency never recommended unsupervised visitations with the father. The father was hostile toward case managers and there were ongoing concerns about the appropriateness of his interactions with A.G.

¶ 54    As of May 2018, the father had not completed DBT, individual therapy, or parent education. He was unsuccessfully discharged from the first referral for parenting classes for refusing to be observed with A.G. On November 20, 2017, Ms. Homyk made a second referral for parenting training and the father attended five sessions. His participation was poor, and he did not comply with a request to attend more sessions. On January 10, 2018, DCFS again referred the father for individual therapy and DBT and he has not complied.

¶ 55    Lisa B. testified that A.G. has been her foster child since January 2016. The foster parents have made A.G. available for visits with the father. Lisa B. has only had communications with the father in the courtroom.

¶ 56    The father testified that he was divorced from the mother in July 2019; shortly after that, he remarried. He maintained that when Ms. Sloan was the caseworker his visits with A.G. went well. Ms. Homyk, however, cancelled visits when he failed to give CHA the required 24-hour notice that he would attend. In addition, CHA no longer scheduled Saturday visits, which the father found to be more convenient. The father believed he would have completed individual therapy with Mr. Hughes, but the agencies "just flat out refused to work with me." The father would welcome any opportunity to see A.G.

¶ 57    During cross examination by the State, the father blamed CHA for his lost visits. On examination by the court, the father agreed that the mother had Factitious Disorder.

¶ 58    At the close of the evidence, the court found the State had proved both grounds (b) and (m). The court denied the father's motion to dismiss the petition to terminate and motion for judgment as a matter of law. The cause proceeded to a best interest hearing.

¶ 59    The State called Ms. Homyk, who reiterated that since January 2016, A.G., who is now eight years old, has been in the same foster home which is safe and appropriate. A.G. is attached to the foster parents and refers to them as mom and dad. She wishes to remain in the foster home. A.G. does well in school and is entering third grade. There are no behavioral issues, mental health diagnoses, or need for medications or counseling. The agency recommended that the father's parental rights be permanently terminated.

¶ 60    Lisa B. and Sean K. both testified that they love A.G. and wish to adopt her. They have bonded as a family.

¶ 61    The father did not testify.

¶ 62    After reviewing the evidence, the circuit court, on July 24, 2019, found that it was in the best interest of A.G. to terminate the father's parental rights. The court entered a written order consistent with its findings as to the fitness and best-interest hearings. Specifically, as relevant here, in its order the court found that by clear and convincing evidence, the father was unfit under grounds (b) and (m) and that it was in the best interest of A.G. to terminate the father's parental rights. The court terminated the father's parental rights and appointed DCFS as A.G.'s guardian with the right to consent to her adoption.

¶ 63    The father filed a second notice of appeal on August 22, 2019, from the July 24, 2019, order (Case No. 1-19-1801). We consolidated the father's appeals.

¶ 64    On appeal, the father argues that the circuit court: (1) erred when it denied "all of the *** motions and pleadings" on June 4, 2019; (2) lacked jurisdiction to enter its adjudication, visitation, and termination orders; (3) erred in terminating his parental rights in that the finding that he was unfit was against the manifest weight of the evidence; and (4) did not afford him due process, fundamental fairness, and equal protection. The father in his initial brief on appeal failed to challenge the circuit court's best interest determination. Therefore, any objection to that determination has been forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). We will address in turn the issues raised by the father after setting forth a legal framework.

¶ 65                                    II. ANALYSIS

¶ 66    The Act provides a "step-by-step" process for deciding whether a child should be removed from his or her parents, made a ward of the court, and whether parental rights should be terminated. *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004). After a petition for wardship has been filed and a child has been placed in temporary custody, the circuit court first must determine whether a child is

17

abused, neglected, or dependent, before it conducts an adjudication of wardship and dispositional hearing. *Id.*; 705 ILCS 405/221 (1), (2) (West 2016). The dispositional hearing and ruling on wardship give "the parents 'fair notice of what they must do to retain their rights to their child' in the face of any future termination proceedings." *In re J.B.*, 2018 IL App (1st) 173096, ¶ 26 (quoting *In re April C.*, 326 Ill. App. 3d 225, 237 (2001)).

¶ 67    Parental rights may be involuntarily terminated where: (1) the State proves that a parent is unfit pursuant to one of the grounds set forth in section 1(D) of the Adoption Act and (2) the trial court finds that termination is in the child's best interest. *In re M.R.*, 393 Ill. App. 609, 613 (2009); 705 ILCS 405/1-1 *et seq.* (West 2016). The State bears the burden of proving by clear and convincing evidence that a parent is unfit under a ground contained in section 1(D) of the Adoption Act. *In re D.F.*, 201 Ill. 2d 476, 494-95 (2002). Any single ground, properly established, is sufficient for a finding of unfitness. *Id.* at 495. "Because the circuit court is in the best position to assess the credibility of witnesses, a reviewing court may reverse a finding of unfitness only where it is against the manifest weight of the evidence. [Citation.] A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident. [Citation.]" *In re Deandre P.*, 405 Ill. App. 3d 945, 952 (2010). A reviewing court may not substitute its judgment for that of the circuit court regarding the credibility of witnesses, the proper weight to be accorded the evidence, or the inferences to be drawn therefrom. *D.F.*, 201 Ill. 2d at 499.

¶ 68    The father's first contention on appeal is that the circuit court erred as a matter of law in denying "all" of his motions and pleadings on June 4, 2019. However, in violation of Supreme Court Rule 341(h)(7), the father in his initial brief did not present cogent arguments with citations to relevant authority or the record as to the error in the denial of each of his motions or pleadings. Therefore, he has forfeited review of his challenges to this order. See Ill. S. Ct. R. 341(h)(7).

¶ 69     We next address the father's argument that the circuit court lacked jurisdiction to enter the adjudication order against the father because the petition to adjudicate made no reference to the father as to the alleged abuse/neglect of A.G. and did not allege that the father was unable or unwilling to protect, train, or educate A.G. The father argues that because of these pleading deficiencies, the adjudication order is void as to him and as a result, the subsequent visitation and dispositional orders are also void.

¶ 70     As to this argument, we note that the father did not challenge the sufficiency of the petition to adjudicate prior to the adjudication hearing. He therefore deprived the State and the circuit court of an opportunity to address any alleged deficiencies in that petition. And he did not timely appeal from the December 21, 2016 adjudication and dispositional orders. To properly perfect an appeal of the circuit court's finding in an adjudication order in a proceeding under the Act, the notice of appeal must be filed within 30 days after the entry of the dispositional order. See Ill. S. Ct. R. 660(b) (eff. Oct. 1, 2001) (appeals from final judgments under the Juvenile Court Act are governed by the rules applicable to civil cases); Ill. S. Ct. R. 303(a)(1) (eff. July 1, 2017) (a notice of appeal must be filed within 30 days of a final order); *In re Smith*, 80 Ill. App. 3d 380, 381 (1980) and S. Ct. R. 662(a) (eff. Oct. 1, 1975) (in juvenile cases, the dispositional order is considered a final and appealable rather than the adjudication order). Thus, we are without jurisdiction to consider the merits and substance of the adjudication order. However, as the father claims the adjudication order is void, we will consider the question. *In re N.G.*, 2018 IL 121939, ¶ 18 (" 'A void order may be attacked at any time or in any court ***.' " (quoting *People v. Thompson*, 209 Ill. 2d 19, 27 (2004)).

¶ 71     A judgment is void when entered by a court without subject matter or personal jurisdiction. *LVNV Funding, LLC v. Trice*, 2015 IL 116129, ¶ 39. Accordingly, as to the father's voidness

argument, we consider whether the circuit court had personal jurisdiction over the father and subject matter jurisdiction over the State's claims at the time of the adjudication hearing.

¶ 72    The State commenced the action by filing the petition to adjudicate against the father under the Act. The father personally appeared on the first court date and was appointed counsel. Thereafter, the father fully participated in the court proceedings. The circuit court therefore had personal jurisdiction over the father. See 705 ILCS 405/2-15(7) (West 2014) ("appearance of the minor's parent *** shall constitute a waiver of service and submission to the jurisdiction of the court"); see also *J.B.*, 2018 IL App (1st) 173096, ¶ 41 (a party's participation in case may give court personnel jurisdiction).

¶ 73    "Subject matter jurisdiction is defined solely as the power of the court to hear and determine cases of the general class to which the proceedings in question belongs." *LVNV Funding*, 2015 IL 116129, ¶ 39. A "court's authority to exercise its jurisdiction and resolve a justiciable question is invoked through the filing of a complaint or petition, pleadings which function to frame the issues for the trial court and circumscribe the relief the court is empowered to order." *In re Custody of Ayala*, 344 Ill. App. 3d 574, 584 (citing *Ligon v. Williams*, 264 Ill. App. 3d 701, 707).

¶ 74    Generally, a petition to adjudicate must "reasonably inform[] the respondent of a valid claim made under a general class of cases of which the circuit court has jurisdiction. *In re T.B.*, 215 Ill. App. 3d 1059, 1059 (1991) (citing *In re G.W.S.*, 196 Ill. App. 3d 107 (1990)). The statutory requirements of the petition to adjudicate are delineated in section 2-13(2) of the Act. That section provides that the petition:

> "shall allege that the minor is abused, neglected, or dependent, with citations to the appropriate provisions of this Act, and set forth (a) facts sufficient to bring the minor under

Section 2-3 or 2-4 and to inform respondents of the cause of action, including, but not limited to, a plain and concise statement of the factual allegations that form the basis for the filing of the petition ***." 705 ILCS 405/2-13(2) (West 2014).

Additionally, the petition "must allege that it is in the best interest of the minor and the public that [the minor] be adjudicated a ward of the court and may pray generally for any relief available under [the] Act." *Id.* § 2-13(3). An issue as to the sufficiency of a pleading is reviewed *de novo*. *Metrick v. Chatz*, 266 Ill. App. 3d 649, 651-52 (1994).

¶ 75    Here, the petition to adjudicate informed the father that the State was contending that A.G. had been neglected based on an injurious environment and abused based on a substantial risk of injury and cited the relevant provisions of the Act. The petition named the father as a parent, legal guardian, and/or custodian of A.G. The petition set forth facts to support its claims relating to A.G.'s medical child abuse, while she resided with the mother and the father. In the petition to adjudicate, the State requested that A.G. be made a ward of the court and that the court enter such orders which were in the best interest of A.G. and grant relief under the Act. Thus, in accord with Sections 2-13(2) and 2-13(3), the father was informed that as a person responsible for A.G.'s care, he was being charged, under the Act, with her abuse and neglect due to her medical abuse.

¶ 76    Contrary to the father's argument, the State was not required to allege the father was unfit in the petition to adjudicate. See 705 ILCS 405/2-13(2); *T.B.*, 215 Ill. App, 3d at 1059. Under the Act, a court in an adjudicatory hearing is to determine whether the minor is neglected and not whether a parent has been neglectful. *Arthur H.*, 212 Ill. 2d 441, 467 (2004); 705 ILCS 405/1-3(i) (West 2014) (an adjudicatory hearing is "to determine whether the allegation of a petition *** that a minor under 18 years of age is *** neglected *** are supported by the preponderance of the evidence."); see also 705 ILCS 405/2-21(i) (West 2014) (a court after hearing the evidence in an

adjudicatory hearing must first determine whether or not a minor is neglected). Therefore, the State was not required to allege who had caused the abuse or neglect of A.G. in order to vest the court with subject matter jurisdiction to conduct the adjudication hearing.

¶ 77    The circuit court had personal and subject matter jurisdiction and its adjudication order was not void. We reject the father's jurisdictional and voidness arguments.

¶ 78    We next consider the father's contention that the circuit court wrongfully terminated his parental rights in that the State failed to prove that he was an unfit parent. As to this argument, we will first examine whether the court's finding under section 1(D)(b) of the Adoption Act was supported by the manifest weight of the evidence (ground (b)).

¶ 79    Section 1(D)(b) provides that a person may be declared an unfit parent for "failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." 750 ILCS 50/1(1)(D)(b) (West 2016). Under this section, "a trial court must focus on the reasonableness of the parent's efforts to show interest, concern, or responsibility and not necessarily on success of those efforts." *In re M.J. and A.J.*, 314 Ill. App. 3d 649, 656 (2000) (citing *E.O.*, 311 Ill. App. 3d 720, 727 (2000)). Additionally, a court "must consider any circumstances that would have made it difficult for the respondent to show interest, concern or responsibility for the well-being of the child." *Id.* Section 1(D)(b) "is disjunctive and failure to show any of the three elements (interest, concern of responsibility) may be considered on its own as a basis for unfitness." *In re Jacorey*, 2012 IL App (1st) 113427, ¶ 28.

¶ 80    In his initial brief, the father does not raise specific errors as to the circuit court's finding that the State established his unfitness on ground (b). Instead, he focuses primarily on the ground (m) finding. Thus, the father has forfeited any challenge to the circuit court's ground (b) finding other than a manifest weight argument. See Ill. S. Ct. R. 341(h)(7).

¶ 81     A.G. was removed from the father's care on December 30, 2015 because she had suffered severe medical abuse, while in his care. Based on the assessment report and his psychological evaluation, the father was to take certain steps, and participate in certain services in order to achieve reunification with A.G. and to assure her wellbeing and safety. Specifically, the father was to complete individual therapy, services for domestic violence, random toxicology testing, substance abuse treatment, and parenting classes. After treating the father, Mr. Hughes concluded the father needed anger management treatment. Because of his aggressive behavior towards Ms. Villasenor, the father was required to attend DBT to assist him in regulating his emotions. All of these services were meant to address the father's psychological issues, correct his maladaptive behavior, reduce his aggression, and assure that he had the necessary parenting skills and tools to safely care for and supervise A.G. Throughout the proceedings, the father was instructed by the court and CHA/DCFS of the need to fulfill the recommendations to achieve reunification. Each of the service plans listed the father's required services and noted the father's lack of progress. The evidence established the father's deep hostility towards the pursuit of these services and his plain failure to complete them.

¶ 82     The father's five attempts at individual therapy, over a two-year period, were sabotaged by his own actions. He insisted in the first referral that the initial session be recorded in violation of CHA policy. He ultimately began individual therapy with Mr. Hughes in December 2016, one year after A.G.'s removal. But he was guarded during sessions and failed to continue with the therapy. The father's referral to Ms. Villasenor was terminated when he placed her in fear with his aggressive behavior. His final attempt at individual therapy was with Dr. Linden. From March to June 2018, the father participated in the "initial phase" of therapy with Dr. Linden. During these sessions, the father blamed the system for his situation and expressed a belief that he was being

23

treated unfairly. Dr. Linden explained to the father that his perceptions of injustice were impeding his ability to make progress toward reunification. The father stopped his treatment with Dr. Linden over a year before the disposition hearing.

¶ 83    The father was not successful in meeting the requirement to complete parenting classes. His first referral was terminated in part because he refused to be observed with A.G. Because his participation in the second referral was poor, the father was required to attend additional parenting sessions; he did not comply. The father refused to participate in the recommended group classes. He never underwent domestic violence or anger management treatment.

¶ 84    The father's failure to engage in most services and his failure to complete others, which were required to achieve reunification with A.G. and assure her welfare, show a lack of concern, interest, or responsibility for her. See *In re T.D.*, 268 Ill. App. 3d 239, 246 (1994) (citing *In re J.F.* 248 Ill. App. 3d 1 (1993); *In re S.J.*, 233 Ill. App. 3d 88 (1992) ("At a fitness hearing, a parent's noncompliance with the service plan may be evidence of unfitness.").

¶ 85    The evidence as to the father's visitation history further supports a conclusion that the father failed to show interest, concern, or responsibility for A.G. When A.G. was removed from his care at the end of December 2015, the father was prohibited from visitations until CHA/DCFS had the results of his psychological evaluation and he began individual therapy. But the father did not have an evaluation until November 2016 and refused to participate in individual therapy until the end of 2017. Ms. Sloan testified that during that time period, the father showed little interest in A.G.'s well-being and did not express a wish for reunification. See *Jacorey*, 2012 IL App (1st) 113427, ¶ 28 (in considering the three factors of section 1(D)(b), a parent's efforts to visit and maintain contact with the children and inquiries to the children's welfare are relevant).

¶ 86    Almost two years after A.G.'s removal, the court permitted the father to have supervised visitations. He was not consistent in attending and did not visit to the full extent allowed. The father blamed CHA for cancelling visits when he did not give proper notice, providing inconvenient dates and times for the visits, and refusing to "work with [him]." When he did attend, the father was appropriate, but struggled to attend to A.G.'s needs and kept her occupied with his cell phone. At the time of the fitness hearing. the father had not visited with A.G. for over a year and had not attempted to communicate with her. He never attained unsupervised visits. This visitation evidence shows the father's obvious disinterest and lack of concern in A.G.'s wellbeing and in reuniting with her.

¶ 87    The manifest weight of the evidence supports a finding that the father failed to show concern, interest, or responsibility for A.G. The court did not err in finding the father was unfit under ground (b).

¶ 88    Because we have found that ground (b) was satisfied, we need not consider the court's finding as to ground (m). *In re J.B.*, 2014 IL App (1st) 140773, ¶ 49. As a result, we also need not address the father's various arguments on appeal as to ground (m). See *In re D.F.*, 201 Ill. 2d at 495.

¶ 89    Finally, we review the father's complaints as to alleged constitutional and other violations during the proceedings. He alleges: (1) a deprivation of due process in the adjudication hearing because the State did not prove he was responsible for A.G.'s abuse and neglect; (2) a denial of equal protection because unlike the mother, he was not aware of what steps he was to take to achieve reunification; (3) a deprivation of his parental rights because the State did not retain an expert to determine whether the mother had Factitious Disorder or whether the father's

recommended services would address the mother's condition; and (4) a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), by the State's failure to disclose certain of the mother's records.

¶ 90   We may readily reject the first three of these arguments. As discussed above, we lack the jurisdiction to address any errors in the adjudication proceeding as the father failed to timely appeal from the adjudication and dispositional orders. And as we have already explained, the State was not required to prove the father was responsible for A.G.'s abuse or neglect at the adjudication hearing. *Arthur H.*, 212 Ill. 2d 441, 467 (2004); 705 ILCS 405/1-3(i); 705 ILCS 405/2-21(i). The father's equal protection argument lacks a factual basis. Despite his protestations, the record shows that he was fully informed throughout the proceedings as to the necessary actions for him to achieve reunification with A.G. His argument as to the failure of the State to retain an expert to determine whether the mother had Factitious Disorder and whether the father's recommended services would correct the mother's condition is meritless. First, Dr. Narang, based on his investigation, reached an opinion within a reasonable degree of medical certainty that A.G. suffered from Factitious Disorder by Proxy. Dr. Gardner testified that the mother's diagnosis of Factitious Disorder had been made with a high probability. The father admitted in his testimony that the mother suffered from the condition. The relevant issue, however, was whether A.G. had been abused or neglected based on her unnecessary and extensive medical treatment. Further, the father's recommended services were not meant to correct the mother's conditions, but were meant to correct the reasons for the father's failures to protect and care for A.G., his psychological and aggression issues, his parenting deficiencies, and his maladaptive behavior. Ms. Reynoso testified that, under the circumstances, the father did not need services related to Factitious Disorder. The circuit court found the services which had been recommended for the father were reasonable for achieving his reunification with A.G.

¶ 91    Finally, we are not persuaded that the State violated *Brady* by its alleged nondisclosure of the mother's reports as to her psychological evaluation, her parental assessment by Dr. Gardner, and her domestic violence victim treatment. Under *Brady*, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady, 373 U.S.* at 87. The State and the GAL respond that *Brady* does not apply to parental termination proceedings which are civil in nature and the father has not established that the mother's reports were not disclosed or that the reports were exculpatory or impeaching as to him. Even assuming both that *Brady* applies here and the reports were not disclosed, we agree with the State and the GAL that the father has not demonstrated that the mother's reports were relevant or exculpatory as to the father's failure to show concern, interest, or responsibility for A.G.

¶ 92                                    III. CONCLUSION

¶ 93    We affirm the orders of the circuit court finding that the father was unfit, terminating his parental rights, and denying the father's motions and pleadings.

¶ 94    Affirmed.