*In re* E.O. *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellee, v. P.O., Respondent-Appellant (Er. O., Respondent)).

Second District   No. 2—99—0492

Opinion filed February 10, 2000.

Steven A. Cox, of Snow, Hunter, Whiton & Fishburn, Ltd., of Freeport, for appellant.

Michael P. Bald, State's Attorney, of Freeport (Martin P. Moltz and Lawrence M. Bauer, both of State's Attorneys Appellate Prosecutor's Office, of counsel), and Thomas D. Murray, of Dixon, for the People.

JUSTICE GALASSO delivered the opinion of the court:

Respondent, P.O., appeals a judgment terminating her parental rights to her daughter, E.O., and her son, B.O., and giving the guardianship administrator of the Department of Children and Family Services (DCFS) the power to consent to the minors' adoption. (The trial court also terminated the parental rights of the minors' father, Er. O.) The trial court found respondent unfit because (1) she abandoned the children (750 ILCS 50/1(D)(a) (West 1998)); (2) she failed to maintain a reasonable degree of interest, concern, or responsibility as to their welfare (750 ILCS 50/1(D)(b) (West 1998)); (3) she did not make reasonable efforts to correct the conditions that were the basis of the removal of the children (750 ILCS 50/1(D)(m) (West 1998)); and (4) she did not make reasonable progress toward the return of the children to her within 12 months of when they were adjudicated dependent (750 ILCS 50/1(D)(m) (West 1996)).[1] Respondent argues that the finding of unfitness was against the manifest weight of the evidence. We affirm.

---

[1]The State's petition was filed on March 6, 1998. By then, section 1(D)(m) of the Adoption Act had been amended to lessen the "reasonable progress" period to nine months. See Pub. Acts 90—27, 90—28, eff. June 25, 1997 (amending 750 ILCS 50/1(D)(m) (West 1996)) (this court recognizes that there is a conflict among the districts over the effective date of the amendment that shortened the "reasonable progress" period to nine months). However, the State's petition relied on the prior version of the statute, and the case was tried on this ground. The change in the statute has no effect on our resolution of the case.

We summarize the background to this litigation and the evidence at the hearing on the State's petition. E.O. was born in 1988, and B.O. was born in 1990. In December of 1992, respondent left Er. O. They divorced a year later. In May and June of 1993, respondent was treated for mental illness, resulting in court proceedings over the custody of the children. On July 28, 1993, after E.O. and B.O. had been in temporary shelter care for about 1½ months, the circuit court adjudicated them dependent, returned them to respondent's care, and kept DCFS as their guardian with the discretion to remove them from respondent. In early August of 1993, respondent was admitted to a psychiatric ward in Madison, Wisconsin, and E.O. and B.O. were placed into foster care in De Kalb County. Respondent was hospitalized twice more in 1993 for mental illness. However, on October 2, 1994, the circuit court entered an order finding that respondent was fit to have custody of the children, although DCFS would continue as their guardian with the power to place them.

On March 6, 1998, the State filed its petition to declare both parents unfit and to terminate their rights to the minors. The witnesses at the hearing on the petition included respondent and the DCFS caseworkers who had been assigned to the case since June of 1994. The court also admitted the pertinent DCFS service plans, although these are not in the record on appeal.

Donna Gilbertson of DCFS's Freeport office testified as follows. She worked on the case for most of the period between June of 1994 and October of 1995. When Gilberston took the case, respondent was living with Doug Howard and paying weekly unsupervised visits to E.O. and B.O. In early October of 1994, the children moved in with respondent and Howard. About three weeks later, Howard "kicked out" respondent, E.O., and B.O., who went to live in a motel. On October 28, 1994, over respondent's protests, DCFS took the children and put them back into foster care, where respondent could make supervised visits weekly. Gilbertson explained that DCFS removed E.O. and B.O. because respondent had no permanent home and the possibility that she would try to return to Howard raised concerns for the children's safety.

Gilbertson stated that, between December of 1994 and June of 1995, respondent did make progress toward the return of the children. Respondent was taking her psychiatric medicine, getting counseling, and cooperating with DCFS. However, on June 26, 1995, in a discussion with Gilbertson and the therapists for respondent and her children, respondent walked out angrily, complaining that counselors should just leave her and her children alone. Later that day, Gilbertson went to respondent's home, where the children were visiting. She

told respondent that, because of concerns about her counseling, weekly visitation would be changed from unsupervised to supervised. Respondent became upset, called Gilbertson "Satan," and reluctantly allowed Gilbertson to take the children back to their foster home.

Gilbertson recounted that, from June 26 until the case was transferred in October of 1995, respondent did not visit the children, contact Gilbertson at all, or undergo the mental health counseling the service plan required. As a result, in October of 1995, the permanency goal was changed to foster or family placement. At respondent's request, Ed Boettner was assigned to the case.

Boettner testified as follows. Respondent did not visit her children for the rest of 1995. On December 19, 1995, respondent did attend the administrative case review. However, between then and June of 1996, respondent did not always keep Boettner informed of her address and missed two of her four scheduled visits. Respondent missed the case review on June 11, 1996, and Boettner could not give her a copy of the service plan because she had moved without telling him. To Boettner's knowledge, respondent did not participate in any counseling or recommended services during this period. Boettner opined that, between December of 1995 and June of 1996, respondent had made no progress toward the return of her children.

Boettner gave a similarly negative evaluation of respondent's progress between June of 1996 and the next case review on December 18, 1996. During this period, respondent kept only two of her six scheduled visits and made no other discernible progress. On November 27, 1996, shortly after she had been in Singer Mental Health Center for 2½ months, respondent called Boettner and told him she thought adoption would be in the children's best interests. At the time, respondent was pregnant and had been off her medicine.

Sometime in 1996, respondent began a relationship with Andre Valenti. In August of 1996, respondent told Boettner that Valenti had beaten her, but, in April of 1997, she told Boettner that she had had a baby and that she and Valenti were going to Florida. She also told Boettner that she was unable to care for E.O. and B.O. and would like them to be adopted. Respondent missed the case review in May of 1997. Between May and October of 1997, she did not visit E.O. and B.O. While respondent was in Florida, she kept Boettner informed of her address and sent four or five cards or letters that he forwarded to E.O. and B.O. As with the two prior service plan periods, Boettner believed that, between May of 1997 and October of 1997, when the case was transferred, respondent made no progress toward the return of E.O. and B.O.

Jennifer Zaluckyj of DCFS's Rockford office had the case from late

October of 1997 to January 15, 1998. She testified as follows. When she accepted the case, E.O. and B.O. were in foster care in Rockford. Respondent was in Florida but had left no address. However, late in October, respondent sent a letter to be forwarded to E.O. and B.O. In November of 1997, respondent's mother told Zaluckyj that respondent was in a psychiatric hospital in Florida.

Respondent did not attend the administrative case review in December of 1997, and her contact with Zaluckyj consisted of two phone calls. On December 9, 1997, respondent called Zaluckyj and asked how her children were doing. Respondent said she was living in a hotel with Valenti, was pregnant again, and wanted to put her three children up for adoption. Respondent gave Zaluckyj no address and told her not to send any information to respondent's mother's address. Respondent called again on January 7, 1998, and told Zaluckyj she had just arrived in Freeport. On January 15, 1998, the case was assigned to Michael LeBlanc in DCFS's Freeport office. Zaluckyj believed that, between October of 1997 and January of 1998, respondent made no progress toward the return of E.O. and B.O.

Michael LeBlanc testified as follows. Late in December of 1997 or in early January of 1998, respondent called the office, said she was back in Stephenson County, and requested visits with her children. On January 29, 1998, LeBlanc met with respondent. She was living alone. They set up a visit for February 27, 1998. Respondent and LeBlanc talked by phone a few times, and the visit went as planned. Later, respondent called and asked when the next visit would be. None was set up before March 6, 1998, when the State filed its petition.

Called as an adverse witness, respondent testified as follows. She suffered from paranoid schizophrenia and had known this since 1993 or 1994. In 1993 or 1994, Singer Mental Health Center prescribed pills for her condition, but, when respondent moved in with Doug Howard, she stopped taking her medicine. While she lived with Howard in the summer of 1994, she was seeing E.O. and B.O. and spent more time with them than the foster parents did. However, on or about October 4, 1994, Howard got drunk and "beat [her] up." Respondent left, taking the children to live with her in a motel.

On October 23, 1994, respondent tried to get back into Howard's residence, but he had changed the locks. Respondent petitioned for an order of protection, alleging that Howard had been there when she showed up and that he had attacked her, necessitating police intervention. In late October, DCFS workers came to the motel and took respondent's children even though she had found a permanent home.

Respondent admitted that, after June of 1995, her visits with her children dropped off substantially. She felt "hopeless" when dealing

with DCFS. About six months after breaking up with Howard, respondent began her relationship with Andre Valenti. In August of 1996, he beat her, and she obtained a two-year order of protection. However, in April of 1997, she had her third child, M., and she and Valenti moved to Florida. At the hearing, respondent admitted that she moved even though Boettner had told her the State was considering trying to terminate her parental rights. While they were in Florida, Valenti beat respondent again, but they were married in November or December of 1997. In December of 1997 or January of 1998, respondent returned to Illinois.

Respondent testified that, in November of 1997, she began taking her medicine by shots every two weeks. She explained that the pills had caused her arms to go numb for long periods, making it hard to sleep at night. At the hearing, respondent did not agree that she could not take care of her children properly when she went off her medication. She stated, "I think I can get by without my medication" but added, "I take it anyway."

Respondent also testified on her own behalf. She related that, when she went to Florida with Valenti, she still tried to keep in touch with her children and with DCFS. She called Boettner about every month and wrote four or five letters to her children. However, she more or less lost hope of getting her children back. In Florida, Valenti beat respondent twice. When they moved back to Illinois, she lived with him briefly until her baby was born in March of 1998. Respondent had not lived with Valenti since then, and she wanted to divorce him.

Respondent returned to Illinois because she missed her children and wanted to "get [her] kids." Since returning, she had had four residences, but all were in Freeport. On her arrival, respondent called DCFS and asked LeBlanc about visiting her children. She visited E.O. and B.O., but, "right before the court hearing," she was told she would not be allowed to do so anymore.

Respondent recalled that, when she moved to Florida, her doctors told her not to take her medicine because she was pregnant with M. She admitted that, when she does not take her medicine, she may have a "nervous breakdown." In or around November of 1997, respondent was hospitalized in Florida and started taking a new medicine by injection. She was still taking it without any side effects, and it was helping her control her emotions. Since respondent started taking this medicine, she had not been hospitalized for mental problems.

Respondent admitted that, in the last two months of 1994 and much of 1995, she stopped going to counseling. As of the hearing, she

had attended but not completed the domestic violence counseling the DCFS service plans required. At times, respondent had felt it was too hard to care for her children and go to counseling too, but she no longer felt that way. She now got counseling every week or every other week, depending on how much free time she had.

The trial judge found that the State had proved respondent unfit on all four of the petition's grounds. The judge emphasized that, since the original adjudication of neglect, respondent had shown a pattern of refusing to take her medicine or attend counseling, with the result that she had recurrent hospitalizations for her mental illness. The judge noted that, although respondent had stopped taking her pills because of their side effects, she had never told her doctors about the problem or inquired whether she could be switched to other medicine that did not have such side effects. Also, even at the hearing, respondent said she believed she could get along satisfactorily without taking her medicine.

The judge also stated that respondent had regularly placed her relationships with abusive men ahead of the welfare of E.O. and B.O. Even after respondent moved away from Howard, she tried to get back into the house. Thus, the judge believed that, when DCFS took respondent's children, its caseworkers were correct to fear that she would try to return to Howard. Respondent's relationship with Valenti also demonstrated her unfitness. She had deliberately left Illinois, greatly distancing herself from her children and DCFS, even though she had been warned that her rights to the children were in serious danger. What cooperation respondent had shown was too little and too late.

The court found respondent was unfit, and, after a hearing, it terminated her rights to E.O. and B.O. and gave DCFS the power to consent to their adoption. Respondent timely appealed.

■ The State had to prove by clear and convincing evidence that respondent was unfit. *In re Latifah P.*, 307 Ill. App. 3d 558, 565 (1999). A trial court's finding of unfitness is entitled to great deference and must be upheld unless it is against the manifest weight of the evidence. *Latifah P.*, 307 Ill. App. 3d at 365. As the grounds for finding unfitness are independent, we may affirm the judgment if the evidence supports the trial court's finding of unfitness on any one of the statutory grounds alleged. *In re C.L.T.*, 302 Ill. App. 3d 770, 772 (1999).

■ We cannot say the trial court erred in finding respondent unfit on at least one of the grounds the State alleged. Specifically, there was sufficient evidence that respondent failed to show a reasonable degree of interest, concern, or responsibility as to the minors' welfare. See 750 ILCS 50/1(D)(b) (West 1998). We recognize that, in evaluating a

parent's conduct, a trial court must focus on the reasonableness of her efforts and not on their success (*In re Adoption of Syck*, 138 Ill. 2d 255, 279 (1990)) and must consider any circumstances that would have made it more difficult for respondent to visit, communicate with, or otherwise show an interest in the well-being of her children (*Syck*, 138 Ill. 2d at 278-79; *In re S.J.*, 233 Ill. App. 3d 88, 113-14 (1992)). Nonetheless, a parent need not be at fault to be unfit (*In re Devine*, 81 Ill. App. 3d 314, 319-20 (1980)), and she is not fit merely because she has demonstrated *some* interest in or affection for her children; her interest, concern, and *responsibility* must be reasonable (*S.J.*, 233 Ill. App. 3d at 114).

In arguing that the evidence did not demonstrate her unfitness, respondent stresses that her chronic mental illness made it harder for her to visit or otherwise care for her children. She asserts that the trial court failed to grasp that the reasonableness of her behavior must be viewed in this context. Also, respondent claims that the evidence shows that she steadily maintained a reasonable level of interest in her children, even when her mental illness affected her so greatly that she neglected most other aspects of her life.

■ We cannot agree with respondent's characterization of the trial court's reasoning, and we cannot say that her interpretation of the evidence is the only reasonable one. The trial court did consider that respondent's mental illness sometimes required her to be hospitalized and necessitated the regular and prolonged use of prescription medicines. However, as the court explained, there was still strong evidence that respondent did not make reasonable efforts to act responsibly toward her children and that, at several crucial points, her voluntary decisions actually distanced her, literally and figuratively, from E.O. and B.O.

Respondent is not quite correct that the trial court simply found, without any supporting evidence, that she voluntarily decided to stop taking her medicine. Instead, the court observed that, although respondent suffered substantial side effects from the pills she was prescribed, she did not inquire whether any available substitute would stabilize her mental condition without causing the side effects. Instead, she simply stopped taking any medicine and waited about three years before starting the injections that she claimed had worked well. Even at the hearing, respondent said she did not necessarily believe she had to take her medicine in order to care for her children. The court also noted that respondent had dropped out of counseling even though the service plans required it, and treating her mental illness was crucial to enabling her to take proper care of E.O. and B.O. Respondent's repeated hospitalizations obviously made it harder for her to visit or

communicate with her children, but the court could find that the decisions respondent made when she was not institutionalized helped to bring about these hospitalizations.

The record also supports the trial court's conclusion that respondent failed to make reasonable efforts to visit or otherwise communicate with E.O. and B.O. Respondent admitted that, even before she left for Florida in May of 1997, she missed most of her scheduled visits with her children. Also, respondent sometimes neglected to keep DCFS informed of her address and missed some case reviews. All these failures were not caused primarily by obstacles beyond respondent's control but, rather, by her own discouragement or inability to make the children's welfare the priority it would have to be if they were ever to be returned to her.

As the trial court observed, respondent's failure to visit her children more regularly or to keep in contact with DCFS also resulted in part from her decision to leave Illinois and move to Florida to continue an admittedly abusive relationship. Respondent undertook this move despite knowing that the State was considering terminating her parental rights and that going so far away would make it harder for her to see her children or communicate regularly with DCFS. Respondent emphasizes that, even when she was in Florida, she sent a card or letter to the children an average of about once every month. While this fact surely demonstrates that she cared about E.O. and B.O. and maintained *some* interest in their welfare, it has limited value in establishing that she showed a *reasonable* degree of interest and *responsibility* for their welfare.

The trial court could conclude that, although respondent was still subjectively interested in her children, her conduct was not reasonable under all the circumstances. See *S.J.*, 233 Ill. App. 3d at 114. The court's finding that respondent was unfit was not against the manifest weight of the evidence, and we must affirm its decision to terminate her parental rights.

The judgment of the circuit court of Stephenson County is affirmed.

Affirmed.

THOMAS and HUTCHINSON, JJ., concur.