NOTICE

Decision filed 08/29/22. The text of this decision may be changed or corrected prior to he filing of a Petition for Rehearing or the disposition of he same.

2022 IL App (5th) 220255-U

NOS. 5-22-0255, 5-22-0256, 5-22-0257 cons.

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* L.F., M.S., and M.F., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Fayette County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | Nos. 19-JA-13, 19-JA-14, |
| v. | ) | 19-JA-16 |
| | ) | |
| R.S., | ) | Honorable |
| | ) | Allan F. Lolie Jr., |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Presiding Justice Boie and Justice Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*: Father waived any defect in personal jurisdiction by appearing and participating in the juvenile court proceedings. The trial court's findings that Father was an unfit person, and that the termination of his parental rights was in the children's best interest, were not contrary to the manifest weight of the evidence.

¶ 2    Respondent, R.S. (Father), appeals the judgment of the circuit court of Fayette County terminating his parental rights to his minor children, L.F., M.S., and M.F., claiming the trial court lacked personal jurisdiction. Father additionally claims that the trial court's findings of unfitness and best interest were in error. For the following reasons, we affirm.

1

¶ 3                          I. BACKGROUND

¶ 4    Respondent, R.S., is the biological father of M.F., born July 13, 2005, M.S., born May 24, 2006, and L.F., born September 9, 2009. Father has not seen his children for several years. In late February or early March of 2019, the children's mother, B.F. (Mother), who is not a party to this appeal, left her children with a relative and sought substance abuse treatment in a facility in Chicago, Illinois. Mother, without completing treatment, discharged herself from the facility a week after her arrival. She did not return for her children. On May 7, 2019, the Department of Children and Family Services (DCFS) was contacted because the temporary caregiver did not have legal authority to assist the children with medical treatment and could no longer provide care.

¶ 5    On May 16, 2019, the State filed juvenile petitions for each of the children alleging that they were neglected based on being in an environment injurious to their welfare, pursuant to the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2018)), because of Mother's conduct. The State's petition averred that Mother left her children with a relative and failed to return. The petition also stated that Mother was reportedly homeless, she had a warrant for her arrest, and Mother had recently used methamphetamines. The petition included Father but did not contain allegations related to Father's conduct.

¶ 6    The shelter care hearing was held after the juvenile petitions were filed. Father's exact whereabouts were unknown, and he did not appear for the hearing. The State requested that the court enter a default judgment against both parents. The State informed the court that temporary custody of the minor children was necessary because the

2

temporary caregiver had no legal authority to care for the children. The trial court found that there was an immediate and urgent necessity, and it was in the best interests of the children to grant shelter care. DCFS was given temporary custody and guardianship.

¶ 7    On July 16, 2019, a certificate of publication was filed indicating that Father, and any other unknown fathers, had received notice by publication that juvenile petitions had been filed by the State. The State did not file an affidavit stating that a diligent search for Father had been performed, as required by section 2-16(2) of the Juvenile Court Act (705 ILCS 405/2-16(2) (West 2020)).

¶ 8    On August 15, 2019, the trial court entered an order of adjudication. Father did not appear. Mother stipulated to the allegations in the juvenile petitions. The court found that the children were neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(b) (West 2018)) because Mother's conduct created an injurious environment to the children's welfare.

¶ 9    On September 12, 2019, Lutheran Children and Family Services (LCFS) filed a dispositional hearing report. The report included information that a search for Father had been performed through the Statewide Automated Child Welfare Information System and Father's exact location was unknown. LCFS believed that Father may have lived in Las Vegas, Nevada. The children were unaware of Father's location.

¶ 10    That same day, the court held a dispositional hearing. Father did not appear for the hearing. The State informed the court that Father lived in Las Vegas, Nevada, and he was served by publication. The court entered an order of disposition which included that Father was unable, for other than financial circumstances alone, and unwilling to care for, protect,

train, or discipline the minors. The court found that it was in the best interest of the minors to remove them from the custody of their parents. Custody and guardianship were placed with the DCFS Guardianship Administrator with authority to consent to required medical and dental treatment. The permanency goal was for the children to return home in 12 months.

¶ 11 On July 9, 2020, the trial court held a permanency review hearing via video conference and Father appeared *pro se*. Father did not raise any issues with regard to the entry of the prior adjudication and dispositional orders. The court asked Father if he wished to have counsel appointed and Father declined. The court rescheduled the hearing for a status conference to determine whether a hearing was necessary to modify the permanency goal.

¶ 12 Throughout the remainder of the proceedings in this case, Father appeared via the court's video conferencing system. The circuit clerk's office emailed notices and pleadings to Father at his request.

¶ 13 On October 8, 2020, a hearing was held on the State's request to modify the permanency goal to substitute care pending court determination of termination of parental rights. Father appeared and objected. He claimed that the court had no authority over him because the court's authority was "from the public democracy" and Father was on the "private side of the Republic." The court explained to Father that he had to file a motion to object to the proceedings in general. Father did not address the State's request to modify the permanency goal. The court entered an order with a permanency goal of substitute care pending court determination of termination of parental rights.

4

¶ 14    On April 29, 2021, the court held a status conference and the LCFS caseworker, April Hosein-Reid, informed the court that she did not have Father's contact information. Father again appeared for the video status conference. The court asked Father to provide Hosein-Reid with his phone number and Father complied. The court additionally addressed Father's behavior because he was calling the courthouse and yelling at the court clerks. The court also admonished Father that he was required to cooperate with Hosein-Reid.

¶ 15    On June 23, 2021, the State filed petitions to terminate Father's parental rights. The State alleged that Father should be found unfit based on three grounds as outlined in the Adoption Act (750 ILCS 50/1(D) (West 2020)). The State claimed that Father failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare (750 ILCS 50/1(D)(b) (West 2020)); Father failed to make reasonable efforts to correct the conditions that were the basis for removing the children (750 ILCS 50/1(D)(m)(i) (West 2020)); and Father failed to make reasonable progress toward the return of the minor within nine months following the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2020)).

¶ 16    On December 2, 2021, the court held a fitness hearing via its teleconferencing platform. Before the State could call its first witness, Father began arguing that the case should be dismissed. The trial court muted Father and explained to him that the court had subject matter jurisdiction and personal jurisdiction over Father. The court stated that Father had previously appeared, had been informed regarding the juvenile petition, and was present for the fitness hearing. The court found that Father submitted himself to the jurisdiction of the court. Before unmuting Father, the court admonished Father to be respectful of the court and noted that Father had left a profane message with a court clerk.

5

Father was then allowed to make his argument that the case should be dismissed, as the court lacked federal jurisdiction, the court was "not of the American," and Father was exempt from American law. The court denied Father's oral motion to dismiss and stated that it was not going to entertain Father's "sovereign citizen nonsense." The court then muted Father so he could not speak, but could hear the proceedings.

¶ 17 The State called Jessica Holt as a witness. The court asked Father if he could hear the witness and to answer by nodding his head. In response, Father gave the court the middle finger on his video screen. The court then stated that Father was showing a "lack of willingness to participate" and that he was "doing nothing to convince the Court that [he was] a fit father."

¶ 18 Holt testified that she was employed by LCFS and that she was assigned as the caseworker from December of 2019 through November of 2020. Holt explained that LCFS was unable to locate Father after performing multiple diligent searches. Father was located after the children obtained Father's contact information. Father did not visit the children or request visitation while Holt was the caseworker. Holt had a conversation with Father over the phone, but she never met him in person. A service plan had not been prepared for Father while Holt was the caseworker because a new caseworker was reassigned to the case after Father was located.

¶ 19 The State called April Hosein-Reid as its next witness. Hosein-Reid was assigned as the caseworker after Holt, and remained the caseworker until October 2021. While Hosein-Reid testified, the court indicated that Father was holding up "profanity-laced notes" on the video conferencing screen. Hosein-Reid testified that she had contact with

Father on one occasion. During a hearing, Father had asked for his current caseworker's information and Hosein-Reid and Father exchanged contact information. Hosein-Reid testified that she spoke to Father over the phone later that same day.

¶ 20    According to Hosein-Reid, Father was given a service plan which required him to complete an assessment and parenting classes. Hosein-Reid researched service providers near Glendale, Arizona, where Father claimed he lived. She sent Father a list of local service providers, along with the service plan. LCFS had also offered Father transportation and partial housing to travel to Illinois for a court hearing. Hosein-Reid testified that Father began contacting the children through Facebook messenger in September 2021. Father did not complete any of the services in his plan.

¶ 21    Father questioned Hosein-Reid and asked why he was not able to see his children. She responded that the children initially refused to talk to Father. The court asked Father to ask his next question and Father stated: "It don't even matter. You all can go f*** each other in the a***, for all I care at this point." The court then muted Father and stated that Father would not be allowed to ask further questions but would be allowed to listen to the proceedings.

¶ 22    Jacquelyn Jones, a caseworker for LCFS, testified next. She had been the caseworker for two months. Jones began by explaining that she had met with the children. The court stopped her testimony because Father held up a sign that said "objection." The court unmuted Father who stated that he objected to "anything and everything you all are saying." Jones resumed her testimony after the court noted Father's continuing objection

and again muted Father. Jones testified that she had attempted to contact Father and he never returned her call. Jones never sent written correspondence to Father.

¶ 23 Jones testified that Father was required to complete an integrated assessment, along with mental health and substance abuse assessments. He was also required to maintain housing. Father had not completed any of the requirements. Although the court had previously stated that Father was no longer allowed to ask questions, Father was given the opportunity to cross-examine Jones. Instead of questioning Jones, the following statements were made:

> "FATHER: Would it even make a difference?
> THE COURT: It's up to you.
> FATHER: All just going through your motions. Why don't you get to it already because all I'm going to do is sue you all, in the end. I ain't got no place for none of you all."

The court then muted Father. After Jones testified, the State rested its case.

¶ 24 Father then testified at the fitness hearing. He understood that parents had to comply with DCFS guidelines and assessments. Father claimed that there was no reason for him to complete the assessments and blamed Mother for the children being in the care of DCFS. He did not understand why he was not allowed to see his children. Father claimed that he never received an opportunity to show that he was fighting for his children. He additionally explained that he was unable to travel to see his children and be able to maintain his employment. Father then stated, "I could care less what you are going to say or do right now, at this point, because I already know what I got to do."

¶ 25 After Father completed his testimony, the State argued that Father should be found unfit because he had admitted that he refused to comply with the service plan "because he

8

wanted a reason to do so, because his children apparently were not enough of a reason." The State argued that refusing to do anything was worse than not showing up and the court should find that Father had failed to maintain a reasonable degree of interest in his children's welfare.

¶ 26 The guardian *ad litem* (GAL) agreed that the State had proven, by clear and convincing evidence, that the parents had failed to maintain a reasonable degree of interest, concern, or responsibility regarding the welfare of their children. The GAL also believed that the parents failed to make reasonable efforts or reasonable progress for the return of the children. Specifically, Father had failed to show any responsibility for the children's welfare and never visited with his children during the two-year time period that the case had been pending. The GAL believed that Father's minimal activities with the children did not demonstrate a reasonable effort or show interest and concern for the children by engaging in "a few FaceTime messages, which were apparently referenced." The GAL argued that Father should be found unfit.

¶ 27 After the GAL's argument, the trial court stated that it would take the matter under advisement. The court asked Father for his mailing address to provide Father with a copy of the court order. Father responded, "Yeah. You know what? You can just email it to me. I live through myself. I don't live anywhere else but through me." The court noted that Father refused to provide his mailing address and the order would be emailed.

¶ 28 On December 7, 2021, the court entered a written order regarding the fitness determination. The order began by stating that Father had initially been in default and that the orders of adjudication and disposition were not appealed. The court also noted that

9

Father repeatedly declined counsel throughout the proceedings. Father had been served with the petition to terminate parental rights via email, at Father's request. Father failed to provide his address to the court and to the caseworkers. Father contested the court's jurisdiction in general at the beginning of the fitness hearing. The court indicated that Father had not objected to being personally served or served through publication. The court stated that, "Father subscribes to a version of the sovereign citizen movement and claims to be a member of the Moorish Nation and not subject to Illinois law." The court concluded that Father had submitted himself to the court's jurisdiction by appearing and participating in the hearings.

¶ 29 The trial court's order also noted that the State had alleged that Father failed to make reasonable efforts to correct the conditions that were the basis for removal of the children and that Father had failed to make reasonable progress toward the return of the children. With regard to these allegations, the court found that the State failed to meet its burden of proof on both of those grounds because it was not Father's conduct that was the basis for the initial removal of the children.

¶ 30 Nevertheless, the trial court did find that Father was unfit because he failed to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare pursuant to section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2020)). The court indicated that Father had not visited the children and had not provided support while the case was pending. Father refused to provide his home address in order for a caseworker to inspect his living conditions. The court stated that for Father to be awarded the children, Father should have complied with the assessments to determine

whether he was a danger to the children and should have allowed for a home inspection. Father, instead, argued that he could not be forced to comply.

¶ 31    On January 17, 2022, Father emailed the court a request for counsel to be appointed. Counsel was appointed to represent Father on January 27, 2022.

¶ 32    The best interest hearing was held on April 14, 2022. Tiana Shear, with LCFS, testified first. The children had been placed in three separate traditional foster homes because no family members were available to care for the children. The children attended school in three different school districts and had not seen each other in months. M.S. and her half-sister, who was not related to Father, were placed together. The oldest child, M.F., refused to see her siblings and wished to be adopted. The other two children did not want to return to their parents. Each of the foster parents had expressed that they wished to adopt the child in their care.

¶ 33    According to Shear, the children were "safe and happy" in their homes. M.F. was having trouble in school. An individualized education plan (IEP) to address M.F.'s needs was being developed. She was also referred for counseling. M.S. was having issues with being disrespectful to her foster parents. L.F. was doing well in school and involved in track.

¶ 34    Shear testified that Father had not met with the children in person during her involvement with the case. LCFS would have arranged visitation for Father to meet with his children, but Father never requested visitation. Father had been offered financial support to travel to Illinois and he declined. Shear testified that Father contacted the children over the phone and through Facebook.

11

¶ 35    M.F.'s foster mother also testified. She confirmed that she was willing to adopt M.F. and loved her. M.F.'s foster mother testified that she wanted to provide M.F. with stability and a family. She was also financially able to care for M.F. The foster mother had a 12-year-old daughter, who M.F. considered as a little sister. M.F. participated in reading, math, and art programs outside of school. She additionally frequented the YMCA to play basketball.

¶ 36    M.S.'s foster mother testified that she loved M.S. and wished to adopt her. When M.S. moved in with her foster family, she was "very out of control." Her foster mother testified that she had addressed M.S.'s needs and was able to care for her and could provide a sense of permanence. The foster mother also believed that she could financially take care of M.S. She was the foster mother to four children, including M.S.'s half-sister, and she had a 14-year-old son. The children all got along with each other, a majority of the time. M.S. and her foster family were involved with the church.

¶ 37    L.F.'s foster mother testified that she loved L.F. and was willing to adopt her. She testified that L.F. believed that she would eventually return to Father or Mother. L.F. had frequent phone conversations with Father. Father would tell L.F. stories about when L.F. was little and said that he wanted to see her. L.F.'s foster mother testified that she has an eight-year-old daughter that considers L.F. to be her big sister. L.F. was doing well at school and was involved in track, volleyball, and cheerleading.

¶ 38    Father also testified. He stated it had been seven years since he had last seen his children. Father had not provided financial support for the children in nine years. Father testified that he left Illinois after M.F. was born because "[Father] had trucks that came

12

after [him] to lynch [him]." Father claimed that the local sheriff told him to leave town for his own safety and Father never returned. M.F. wanted Father to move back to Illinois, but Father would not return because of the prior situation.

¶ 39 Father also testified that M.F. had been sexually assaulted and was upset with Father for not doing anything about the incident. Father claimed that he had only recently learned that M.F. was sexually assaulted. M.F. had also told Father that she did not believe he was fighting to gain custody of her. Father had not spoken to M.F. or M.S. for several months prior to the best interest hearing. Father testified that he spoke to L.F. frequently when she was not busy with school. Father stated that he loved his children and believed that they loved him. Father testified that he had two jobs and family support that would assist with caring for the children.

¶ 40 Father additionally testified that he had not seen his children because his caseworkers never set up visitation in person or through video conferencing. Father claimed that LCFS never offered him financial assistance to return to Illinois. He additionally claimed that he never completed assessments or services because he never received a service plan.

¶ 41 Father testified that he had a disabled son in addition to his three children involved in this case. His son was nine years old and lived in Springfield, Illinois. After Father was asked if his son was in a medical facility, Father refused to answer. The court found that Father was nonresponsive and refused to answer questions that the court deemed relevant. Father started arguing with the court and then he was muted. No further questions were

asked by the State or the GAL. The court asked Father for his mailing address and Father refused to answer. Witness testimony was then concluded.

¶ 42 The State then argued that it was in the best interest of the children to remain in their foster homes. The children were in stable, loving, and caring homes. The foster parents were addressing the children's financial, spiritual, mental, and physical needs. Each foster family wished to proceed with adoption.

¶ 43 Father's counsel argued that Father was not listed in the juvenile petition as the offending parent. Counsel argued that it was not in the children's best interest to terminate Father's parental rights. The children had been placed in three different homes and never saw each other. The two older children were struggling. Father had maintained contact with L.F.

¶ 44 The GAL believed that the foster parents had done a remarkable job. The GAL further believed that the State had met its burden of proving by a preponderance of the evidence that it was in the best interests of the children to terminate Father's parental rights. The trial court took the matter under advisement.

¶ 45 On April 19, 2022, the trial court entered an order regarding the best interests of the children. The order acknowledged that it was obligated to assess the best interest of each child according to the statutory factors required by section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2020)). The court outlined the statutory factors and applied those factors to the evidence presented for each child. The court additionally found that Father had not made efforts to gain custody of the children while the case was pending. The court also found that Father's testimony was not credible when he testified that he

14

feared being lynched if he returned to Fayette County and alleged that LCFS did nothing to help him. The order also noted that Father continually refused to provide his address to the court. The trial court found that it was in the best interest of each child to terminate Father's parental rights. This appeal followed.

¶ 46                                   II. ANALYSIS

¶ 47    On appeal, Father claims that the trial court lacked personal jurisdiction over him because the State failed to adhere to the affidavit procedure required for serving notice by publication in juvenile proceedings. Father additionally claims that the trial court erred in finding that Father was an unfit parent and finding that it was in the children's best interest to terminate Father's parental rights.

¶ 48                              A. Personal Jurisdiction

¶ 49    The legal question of whether the trial court obtained personal jurisdiction over the respondent is reviewed *de novo*. *In re Dar. C.*, 2011 IL 111083, ¶ 60. "If a court lacks either subject matter jurisdiction over the matter or personal jurisdiction over the parties, any order entered in the matter is void *ab initio* and, thus, may be attacked at any time." *In re M.W.*, 232 Ill. 2d 408, 414 (2009).

¶ 50    A respondent may have personal jurisdiction imposed upon him by effective service of a summons or he may consent to personal jurisdiction by his appearance. *In re M.W.*, 232 Ill. 2d at 408. Under section 2-15 of the Juvenile Court Act the clerk of the court shall issue a summons to the minor's legal guardian or custodian and to each person named as a respondent when a juvenile petition is filed. 705 ILCS 405/2-15 (West 2018). Where the

15

respondent's whereabouts are unknown, section 2-16 of the Juvenile Court Act allows for service by publication. 705 ILCS 405/2-16 (West 2018).

¶ 51 For the State to proceed with notice by publication, a diligent inquiry of a respondent's current and last known address is required. 705 ILCS 405/2-16(2) (West 2018). If a respondent cannot be located after conducting a diligent inquiry, "petitioner's attorney shall file an affidavit at the office of the clerk of court in which the action is pending showing that respondent on due inquiry cannot be found or is concealing his or her whereabouts so that process cannot be served." 705 ILCS 405/2-16(2) (West 2018). Additionally, "the court may not enter any order or judgment against any person who cannot be served with process other than by publication unless notice by publication is given or *unless that person appears*." (Emphasis added.) 705 ILCS 405/2-16(2) (West 2018). The State concedes that it failed to file an affidavit stating that a diligent search had been performed pursuant to section 2-16(2) of the Juvenile Court Act. However, the State argues that Father's appearance resulted in a waiver of service of summons and the trial court had personal jurisdiction over Father when he appeared.

¶ 52 According to section 2-15(7) of the Juvenile Court Act, the service of summons in juvenile proceedings may be waived. Section 2-15(7) states as follows:

> "The appearance of the minor's legal guardian or custodian, or a person named as a respondent in a petition, in any proceeding under this Act shall constitute a waiver of service of summons and submission to the jurisdiction of the court, except that the filing of a motion authorized under Section 2-301 of the Code of Civil Procedure does not constitute an appearance under this subsection. A copy of the summons and petition shall be provided to the person at the time of his appearance." 705 ILCS 405/2-15(7) (West 2018).

16

¶ 53    Father first appeared for a hearing on July 9, 2020, and failed to file a motion challenging personal jurisdiction under section 2-301 of the Code of Civil Procedure. 735 ILCS 5/2-301 (West 2018). Father continued to appear and participate in the proceedings thereafter.

¶ 54    Father claims, however, that he objected to the court's jurisdiction during the December 2, 2021, fitness hearing, and should be excused from following section 2-301 because he proceeded *pro se*. The arguments raised by Father on December 2, 2021, however, failed to challenge personal jurisdiction for the State's failure to fully comply with the requirements for service by publication. We note that the trial court repeatedly offered to appoint counsel and informed Father during the October 8, 2020, hearing, to file a motion to object to the proceedings in general. Father initially refused counsel and failed to file any motions. "*Pro se* litigants are presumed to have full knowledge of applicable court rules and procedures, including procedural deadlines with respect to filing motions." *Steinbrecher v. Steinbrecher*, 197 Ill. 2d 514, 528 (2001).

¶ 55    We additionally note that Father repeatedly refused to provide the court with his address. Father was provided with documents from the clerk of the court via email at Father's request. As such, Father's receipt of the court documents and participation in the court hearings indicates he consented to personal jurisdiction and waived this issue.

¶ 56                    B. Termination of Parental Rights

¶ 57    Termination of parental rights proceedings are governed by the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2020)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)). Section 2-29 of the Juvenile Court Act provides a two-step process for the

17

involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2020). First, the trial court must find that the parent is unfit as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)) based on clear and convincing evidence. *In re J.L.*, 236 Ill. 2d 329, 337 (2010). The trial court's finding may be affirmed where evidence supports a finding of unfitness on any of the grounds alleged by the State. *In re C.W.*, 199 Ill. 2d 198, 217 (2002). After the court makes a finding of unfitness, the trial court then determines whether the State has proven that it is in the child's best interest to terminate parental rights by a preponderance of the evidence. *In re D.T.*, 212 Ill. 2d 347, 366 (2004).

¶ 58                              1. Fitness Determination

¶ 59    The trial court concluded that Father was unfit because he failed to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare (750 ILCS 50/1(D)(b) (West 2020)). A determination of unfitness involves factual findings and credibility assessments, and the trial court's factual findings will not be reversed unless they are against the manifest weight of the evidence. *In re M.J.*, 314 Ill. App. 3d 649, 655 (2000). A determination is against the manifest weight of the evidence if the opposite conclusion is clearly evident. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005).

¶ 60    "In determining whether a parent showed reasonable concern, interest or responsibility as to a child's welfare, we have to examine the parent's conduct concerning the child in the context of the circumstances in which that conduct occurred." *In re Adoption of Syck*, 138 Ill. 2d 255, 278 (1990). In evaluating Father's conduct, the trial court must focus on the reasonableness of his efforts and not on his success. *In re E.O.*, 311 Ill. App. 3d 720, 727 (2000). The court may consider evidence regarding the completion of

18

the service plan when determining whether Father had demonstrated interest, concern, or responsibility. *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 35. "A parent need not be at fault to be unfit." *In re E.O.*, 311 Ill. App. 3d at 727.

¶ 61    The trial court must also consider any circumstances that would have made it more difficult for Father to visit, communicate with his children, or show interest in his children's well-being. *In re E.O.*, 311 Ill. App. 3d at 727. "If personal visits with the child are somehow impractical, letters, telephone calls, and gifts to the child or those caring for the child may demonstrate a reasonable degree of concern, interest and responsibility, depending upon the content, tone, and frequency of those contacts under the circumstances." *In re Adoption of Syck*, 138 Ill. 2d at 279.

¶ 62    Father argues that because he communicated with his children, attended court, and maintained contact with his caseworkers, he demonstrated a reasonable degree of interest. Father claims that in-person visits with his children would have been difficult or impractical because he lives outside of Illinois.

¶ 63    Father had not seen his children in person for several years and he never requested visitation with his children. Father was offered financial support for transportation expenses to return to Illinois and he refused. Father began to contact his children through Facebook messenger in September 2021, a couple months prior to the fitness hearing.

¶ 64    Although Father attended hearings, Father was frequently muted by the court during court proceedings for his disrespectful behavior. During the fitness hearing, Father made an obscene gesture into the camera and displayed "profanity-laced notes." The court admonished Father that his behavior was "doing nothing to convince the Court that [he

was] a fit father." Father also refused to provide his mailing address to receive notices from the court.

¶ 65 Father also failed to comply with his service plan. He was required to complete an integrated assessment, along with mental health and substance abuse assessments, and maintain housing. His caseworker, Hosein-Reid, provided Father with a list of service providers near his home in Arizona and Father failed to participate. Over the course of the case, Father interacted with caseworkers on only two occasions. His caseworker, Jones, testified that she had never spoken to Father because he never returned her call. Father was also guarded about his residence and failed to demonstrate that he was able to maintain housing.

¶ 66 The evidence presented at the fitness hearing clearly and convincingly established that Father failed to show a level of reasonable concern, interest, or responsibility as to the children's welfare. Considering all of the evidence, the trial court's determination that Father was unfit was not against the manifest weight of the evidence.

¶ 67                         2. Best Interest Determination

¶ 68 After the court determines whether a parent is unfit and their rights can be terminated, the focus shifts to the child's best interest and whether parental rights should be terminated. *In re S.K.B.*, 2015 IL App (1st) 151249, ¶ 48. "The parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d at 364. The trial court's best interest determination will not be disturbed unless it is contrary to the manifest weight of the evidence. *In re R.L.*, 352 Ill. App. 3d 985, 1001 (2004).

20

¶ 69   In making a best interest determination, section 1-3(4.05) of the Juvenile Court Act requires a trial court to consider a number of statutory factors. 705 ILCS 405/1-3(4.05) (West 2020). "Additionally, a court may consider the nature and length of the child's relationship with his present caretaker and the effect that a change in placement would have upon his emotional and psychological well-being." *In re Jaron Z.*, 348 Ill. App. 3d 239, 262 (2004).

¶ 70   Father testified that he loves his children. However, he had not seen his children in seven years and had not provided them any financial support. Shear testified that the children felt safe and happy in their foster homes. The children had also bonded with the other children in the households. Each foster parent testified that they loved their foster child and wished to adopt. And each foster parent had the financial ability to care for the child in their care. M.F. wished to be adopted and the other two children did not want to return to their parents.

¶ 71   M.F. and M.S. had exhibited some behavioral issues, but their foster parents were addressing their needs and the children were improving. M.F.'s foster mother was addressing her educational issues, as well, by moving forward with the IEP process. L.F. was excelling in school and with her extracurricular activities.

¶ 72   Sufficient evidence was presented for the trial court to make its best interest determination with regard to each child. Accordingly, we find that the trial court's determination that it was in the children's best interest to terminate Father's parental rights was not against the manifest weight of the evidence.

¶ 73                            III. CONCLUSION

¶ 74    For the foregoing reasons, we affirm the judgment of the trial court of Fayette County.


¶ 75    Affirmed.