2025 IL App (2d) 250278-U
No. 2-25-0278
Order filed November 18, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* J.E.R., J.O.R., J.R., and E.R., Minors, | ) | Appeal from the Circuit Court |
| | ) | of McHenry County. |
| | ) | |
| | ) | Nos. 22-JA-87 |
| | ) | 22-JA-88 |
| | ) | 22-JA-89 |
| | ) | 22-JA-90 |
| | ) | |
| | ) | Honorable |
| (The People of the State of Illinois, Petitioner- | ) | Carl E. Metz, |
| Appellee v. Erica B., Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Hutchinson and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Appellate counsel's motion to withdraw granted, where there were no issues of arguable merit regarding the trial court's findings that respondent was unfit and it was in the minors' best interests for her parental rights to be terminated.

¶ 2    Respondent, Erica B., appeals from the trial court's orders finding (1) her unfit to parent her children, J.E.R., J.O.R., J.R., and E.R., and (2) that it is in the minors' best interests for her parental rights to be terminated.

¶ 3    Pursuant to *Anders v. California*, 386 U.S. 738 (1967), respondent's appellate counsel moves to withdraw.  See, *e.g.*, *In re S.M.*, 314 Ill. App. 3d 682, 685 (2000) (*Anders* applies to

termination cases).  Counsel states that she has read the record and has found no issues of arguable merit.  Further, counsel supports her motion with a memorandum of law, providing a statement of facts, potential issues, and argument as to why those issues lack arguable merit.  Counsel served respondent with a copy of the motion and memorandum, and we advised respondent that she had 30 days to respond.  That time has passed, and she has not responded.  For the reasons set forth in counsel's memorandum of law, we agree that it would be frivolous to argue that the trial court's findings were against the manifest weight of the evidence.

¶ 4                                    I. BACKGROUND

¶ 5      Respondent is mother to J.E.R. (born July 8, 2019), J.O.R. (born February 25, 2018), J.R. (born April 18, 2017), and E.R. (born October 14, 2010).   Their father, Jeremy R., is not party to this appeal, but has appealed in case No. 2-25-0272.  On September 16, 2022, the minors came into care after a shelter care hearing that was prompted by a hospital visit concerning J.R., Jr. (born December 25, 2007), respondent's eldest child, who is not a subject of this appeal.  Thereafter, on March 24, 2023, the four minor children were adjudicated neglected based upon a lack of support, education, and care and for being in an environment injurious to their welfare.  On April 21, 2023, a dispositional order was entered in which the Department of Children and Family Services (DCFS) was named as their guardian and custodian.  Ultimately, on November 1, 2024, the State petitioned to terminate respondent's parental rights, alleging that she was unfit, based upon her failure to: (1) maintain a reasonable degree of interest, concern, or responsibility for the minors (750 ILCS 50/1(D)(b) (2022)); (2) protect the minors from the conditions within their environment injurious to their welfare (*id.* § 1(D)(g)); (3) make reasonable efforts to correct the conditions that were the basis for the minors' removal for a nine-month period between March 24, 2023, and October 11, 2024 (*id.* § 1(D)(m)(i)); and (4) make reasonable progress toward the minors' return

home between March 24, 2023, and October 11, 2024 (*id.* § 1(D)(m)(ii)).

¶ 6    At the fitness hearing, the court took judicial notice of the prior court orders; permanency-review hearings; and DCFS service plans, reports, and other exhibits.  As relevant here, some of those exhibits reflected that respondent demonstrated limited cognitive functioning, difficulty providing consistent and reliable responses, and that she loved her children, but denied that her cognitive capacities were a hinderance to her parenting or ability to protect them from neglect and harm.  Further, a service plan from February 2024 indicated that it was not clear how much respondent retained from parenting classes.  The June 5, 2024, service plan suggested that respondent attend a parenting capacity evaluation to see if there was anything preventing her from understanding what she was learning.  An August 2024 service plan also reflected continued concerns that respondent could not understand what she was learning or apply it.  Finally, a June 24, 2024, report to the court explained that respondent had completed a psychological evaluation, which reflected that respondent did "not appear to have the cognitive abilities to navigate any demands other than the most basic functions and would be expected to require regular prompts and guidance" and, further, that "the current low level of cognitive functioning is significant and warrants neurological follow up to rule out brain injury (particularly due to suspected domestic violence history) or other organic problems."

¶ 7    Dionca Harper, Child Protection Specialist for DCFS, testified concerning observations that she had documented in her September 2022 investigative report, *i.e.*, the conditions of neglect that led to protective custody of the children.  Specifically, the report reflected that Harper had been called to the hospital to observe J.R., Jr., who was severely malnourished, in "very bad shape," and could not lift his head off the pillow.  Harper testified that he was small for his age,

nonverbal, and his leg was not lying normally and it was in an "L-shape."[1] Harper then went with a police officer to the family residence in Woodstock, where garbage was piled up inside the townhome, the carpet was soiled with food and dirt, mold was in the bathroom, and the youngest child was wearing a soiled diaper, had not been bathed, and had dry feces on his hair and nails. One of the children had been sleeping on a mattress on the floor. The investigative report noted that the children "appeared to be in a feral state." The three youngest children were confined upstairs by a dog gate affixed with bungee cords, and they were observed eating crumbs and candy off of the floor. The report reflected that only one of the five children is verbal. The children all appeared malnourished, despite there being food in the home.

¶ 8 Respondent reported to Harper that Jeremy came to the house to help her with the children. He was not living there. The report reflected further that respondent reported being "overwhelmed" at home. When Harper asked respondent to pack a bag for the children, it was hard to find clothes and shoes that fit them.

---

[1]According to the investigative report, Woodstock police and the high school resource officer went to the residence because J.R., Jr., age 14, had not attended school yet that year, and the school was not able to get in contact with respondent. When the officer eventually reached respondent, she stated that J.R., Jr. was not home, she did not know where he was, and that she thought his uncle took him. However, she then reported that he was in bed, as he recently broke his leg, but later investigation reflected that he had broken his leg in 2020. When the officer made entry into the residence, J.R. Jr., was found lying on the floor upstairs, appeared malnourished, was unable to walk, and had soiled himself. J.R. Jr. had a history of autism spectrum disorder and is nonverbal.

¶ 9  Harper confirmed that her role was to conduct the initial investigation; however, she continued to investigate the family upon receiving a subsequent report in late 2022 or early 2023. The report concerned allegations that the parents had returned to the home, despite a stay-away order. At that time, the children were residing with their grandparents, who had moved into the home to allow the children to remain there.

¶ 10  Diana Carrasco, case worker for Youth Services Bureau (YSB), testified to integrated assessments, progress reports, and service plans prepared by YSB, which were admitted into evidence. A February 2023 integrated assessment and service plan recommended that respondent complete the following goals and services: (1) individual therapy; (2) domestic violence victim therapy; (3) support services recommended for parents with special needs children; (4) parenting education focused on children with special needs and developmental delays, "while meeting her cognitive challenges"; (5) parenting coaching; (6) family therapy, when therapeutically appropriate; (7) "education in available resources"; (8) maintain a clean and sanitary home; (9) become more involved in the children's academic and developmental treatments; and (10) participate in regular and consistent visitation with the children. Also, the assessment reported that the school-aged children had not been enrolled in school and had already missed at least half, if not more, of the school year.

¶ 11  Carrasco testified that respondent completed a mental health assessment in May 2024, one year after the integrated assessment, and was engaged in individual therapy but had not completed it. According to Carrasco, based on her conversations with respondent, respondent was not consistently attending therapy. Respondent had completed parenting classes through ROAN Family Services. To Carrasco's knowledge, ROAN's parenting classes addressed children with special needs and met respondent's own cognitive challenges. However, respondent had not

completed parenting coaching with ROAN and had missed three scheduled sessions. ROAN also reported that it did not think respondent understood what she was learning and, therefore, respondent was referred instead to Family Focus for additional parenting coaching. There, respondent was becoming more competent in her parenting, and Family Focus reported that, with support and training, she would be successful in the future. However, the parenting classes had prompted a recommendation that respondent complete a parent capacity assessment and a psychological assessment (which is more in depth than a mental health assessment). Carrasco reported additional concerns about respondent's delay in scheduling appointments, attendance, and that, 19 months after the case opened, respondent was not close to reunification. She explained that respondent was not close to reunification due to the late start for services and insufficient evidence that respondent was participating, engaged, and applying what she learned. Again, Carrasco noted that, after referrals were made, it took respondent more than one year to begin services.

¶ 12 Further, Carrasco testified that the parents' visits were supervised, originally by relatives, but, after the relatives permitted unsupervised visits, the children were split into multiple traditional foster placements. From February to May 2023, since the children were in five locations, the weekly visits were conducted via Zoom, with Carrasco supervising. Respondent participated consistently. In mid-May 2023, weekly visits began in person at the Aurora YSB location, as it was the "mid-point" for all parties. Aurora is approximately an hour and fifteen minutes from respondent's Woodstock residence. Both respondent and Jeremy were inconsistent with their weekly visits, canceling one or two times each month until August 11, 2023, at which time the parents willingly stopped all visits. The parents refused to visit the children during the holidays and two of the four children's birthdays. Later, in March 2024, the parents began visiting

again, although their attendance for the weekly Friday visits between March and October 2024 included at least one monthly cancellation. The parents would confirm the visit 24 hours in advance, then cancel the day of the visit. Carrasco testified that respondent would sometimes call to cancel the visitation, but usually Jeremy would make the call and would cancel: "[s]ometimes it was due to transportation. Sometimes it was money. Sometimes it was having doctors' appointments and not being able to make it on time. Sometimes it's due to running errands." Although Carrasco offered to accept and deliver gifts and cards to the children, the parents never provided any, did not bring any to visits, and did not mail any to the foster parents. Carrasco agreed that respondent never said she did not want to see her children.

¶ 13    Carrasco acknowledged that the parents indicated they had transportation issues for the visits, and the agency discussed train transportation with them, offered gas cards, and provided Ubers to facilitate their attendance. Carrasco acknowledged that the agency placed some limits on providing transportation assistance and could not always arrange rides the same day as visitation or every week. Although the parents requested increased visitation, it was never provided, due to their not participating in services and, specifically, respondent's failure to participate in individual therapy. When respondent did participate in therapy, however, visits still did not increase due to the children being in school and scheduling constraints for all involved. Visitation always remained supervised. Respondent did not present evidence on her own behalf.

¶ 14    The trial court found that the State proved all allegations of unfitness by clear and convincing evidence. In sum, the court considered all testimony, exhibits, and evidence presented, and it found Harper and Carrasco credible, direct, and forthcoming in their responses and that their testimonies were consistent with the admitted exhibits. It noted, in part, that the parenting coach concluded that respondent was not comprehending information and had recommended a

psychological assessment. That assessment was performed in February 2024, and it reflected that respondent "warranted neurological follow up to rule out brain injury or other organic problems. Simply, [respondent] lacked cognitive functioning to meet the needs of the [m]inors. [Respondent's] cognitive functioning could handle only the most basic needs of herself." The court found, ultimately, that respondent could not demonstrate an understanding as to why the minors came into care, did not appreciate the "squalid" conditions in which they were being raised or how those conditions impacted them, and could not understand or apply the skills taught during parenting class. The court found that it took respondent more than one year to schedule and take a mental health assessment, relied upon Jeremy to schedule her domestic violence assessment, and her actions,

> "or rather inability to act, were consistent with [YSB's] significant concerns with [respondent's] cognitive abilities. [Respondent's] inability to perform scheduling tasks or articulate results of an evaluation, shows the Court that [respondent] will be unable to schedule needs for the minors or articulate to providers of the minors issues affecting the minors. [Respondent] is unable to care for the minors."

¶ 15    In addition, the court found that respondent failed to maintain consistent visitation from mid-May 2023 through October of 2024, and, then, ceased visitation from August 2023 until March 2024. When visitation resumed, respondent's attendance was again inconsistent. It further found that respondent's (1) failure to fully engage in the recommendations; (2) inability to schedule or undergo a mental health evaluation for over one year; (3) inability to comprehend and to apply the teachings of the parenting class; and (4) inconsistent and, at times, refused visitation clearly showed her lack of interest, concern, or responsibility as to the minors' welfare. The "horrible" conditions in which the minors were living reflected respondent's failure to protect them

from conditions injurious to their welfare; respondent failed to make reasonable efforts or progress toward the goal or reunification, where she demonstrated an inability to understand what she needed to do to correct the conditions, reflecting an inability to care for the minors; and she was not close to reunification.

¶ 16    In sum, the court found that the State proved by clear and convincing evidence that respondent was unfit on all bases alleged.  Later, after a separate hearing, the court also found that it was in the minors' best interest for respondent's parental rights to be terminated.  Respondent appeals.

¶ 17                              II. ANALYSIS

¶ 18    Proceedings to terminate parental rights are governed principally by the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2022)) (Act) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2022)).  The Act provides a two-step process for the involuntary termination of parental rights.  *In re Deandre D.*, 405 Ill. App. 3d 945, 952 (2010).  First, the State must prove that the parent is unfit by clear and convincing evidence.  *Id.*  Section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)) lists the grounds under which a parent can be found unfit.  *In re Tiffany M.*, 353 Ill. App. 3d 883, 889 (2004).  Second, if the court makes a finding of unfitness, the court then considers whether it is in the best interests of the minor to terminate parental rights.  *Deandre D.*, 405 Ill. App. 3d at 953.  The State has the burden of proving by a preponderance of the evidence that termination is in the minor's best interests.  *Id.*

¶ 19    As previously noted, respondent's appellate counsel has moved to withdraw and states that she has read the record and has found no issues of arguable merit.  Specifically, counsel sets forth one potential issue that she believes would ultimately fail; namely, that, where respondent was not provided sufficient services to accommodate her cognitive disability, the court erred in finding

respondent unfit. Counsel notes that there was no testimony or evidence that YSB provided any modification to or accommodations for respondent's services, in order to meet her cognitive disability. "Despite the service plans and court reports acknowledging [respondent's] cognitive limitation and low functioning, [YSB] did nothing to offer services that may have helped her achieve the desired goal and outcome." Counsel notes that, to aid parents in family reunification, the State is required to provide reasonable accommodations in provided services. See 42 U.S.C. §§ 12101-12213 (2022); 29 U.S.C. §§ 701-794 (2022). Counsel also likens this case to *In re I.W.*, 2018 IL App (4th) 170656, ¶ 92 (DeArmond, J., specially concurring), where one justice noted that nothing had been done to facilitate services at a level that the respondent could comprehend, despite the respondent's known cognitive defects. Nevertheless, counsel acknowledges that this issue was not raised below, new issues may not be raised for the first time on appeal, and that the plain-error exception to forfeiture is a narrow one. Further, counsel concedes that the case law on this issue is not favorable to respondent, noting that our supreme court rejected a similar argument, where the circumstances reflected that the failure to maintain a reasonable degree of interest, concern, or responsibility did not hinge on the parent's compromised intellectual capacity. *In re M.I.*, 2016 IL 120232, ¶¶ 36-39. Here, counsel asserts, where respondent was inconsistent with visitation or did not visit at all, the trial court had at least one valid basis for finding unfitness, separate and apart from the lack of appropriate services related to respondent's cognitive abilities. As such, given respondent's failure to regularly engage in visitation and forfeiture of the issue, counsel represents that she is unaware of any other case law that would support reversal or remand. We agree.

¶ 20   We will reverse an unfitness finding only where it is against the manifest weight of the evidence, that is, where the determination is unreasonable. *In re D.W.*, 386 Ill. App. 3d 124, 139

(2008). "Generally, a finding of unfitness is entitled to deference and [ ] should be upheld." *In re J.J.*, 201 Ill. 2d 236, 253 (2002). The grounds for finding unfitness under the Adoption Act are independent, and we may affirm the trial court's judgment if the evidence supports any one of the grounds alleged. See 750 ILCS 50/1(D)(m) (West 2022); see also *In re B'Yata I.*, 2014 IL App (2d) 130558-B, ¶ 30.

¶ 21    We agree with appellate counsel that, even if she were to raise the issue that, despite respondent's known cognitive deficits, she was not provided reasonable accommodations to help her meet the goals for reunification, the argument would fail. Even setting aside forfeiture, as counsel notes, our supreme court rejected a similar argument, where, as here, the evidence reflected that the failure to make reasonable efforts did not stem solely from circumstances dependent on cognitive deficiency. *In re M.I.*, 2016 IL 120232, ¶¶ 29-31. The court noted that "[a] parent's circumstances, such as an intellectual disability, do not necessarily or automatically redeem a parent's failure to demonstrate reasonable interest, concern, or responsibility." *Id.* ¶ 29. Rather, it explained, "the question is whether a parent's then-existing circumstances provide a valid excuse." *Id.* Relying, in part, on this court's decision in *In re E.O.*, 311 Ill. App. 3d 720 (2000), the court held that, where the trial court had recognized the respondent's obstacles and intellectual disability, but had found he had the ability to attend visitation and failed to do so, his actions failed to demonstrate reasonable interest and his intellectual disability did not provide a valid excuse for failing to attend visitation, particularly where that failure appeared to be a result of voluntary decisionmaking. *Id.* ¶¶ 30-31. The court could not, therefore, conclude that the respondent's failure to consistently attend visitation was attributable to anything but a lack of interest. *Id.* ¶ 31.

¶ 22    Here, the evidence reasonably reflected that respondent demonstrated an inability to comprehend and apply the lessons from parenting classes and coaching, and the psychological

evaluation demonstrated significant low-level cognitive functioning. These obstacles were acknowledged by the trial court in its ruling. However, the court reasonably found respondent unfit on *multiple* bases, including for her failure to consistently attend visitation and, at times, her *refusal* to attend visitation. The record does not reflect that respondent's failure to attend visitation was related to her cognitive functioning or was anything other than voluntary. On the contrary, the record demonstrated that respondent frequently confirmed visitation the day before the visit but then cancelled visitation on the day it was scheduled. Jeremy explained to Carrasco that the reasons for cancelling included scheduling conflicts, other appointments, or transportation, but none of those reasons suggested respondent's *inability* to attend for reasons related to cognition. With respect to transportation difficulties, again, the record did not reflect that those challenges related to cognitive functioning, as opposed to simply distance or scheduling issues, and, further, YSB sometimes accommodated those challenges by offering train information, Ubers, and gas cards. Thus, where we may affirm the trial court's judgment if the evidence supports any one of the grounds alleged, and where the evidence supports the court's finding that respondent failed to maintain a reasonable degree of interest, concern, or responsibility for the minors *separate and apart from* any cognitive challenges, an argument that the court erred on this basis would fail.

¶ 23    In short, after examining the record, the motion to withdraw, and the memorandum of law, we agree with counsel that the appeal presents no issues of arguable merit. We grant counsel's motion to withdraw and affirm.

¶ 24                                III. CONCLUSION

¶ 25    For the reasons stated, the judgment of the circuit court of McHenry County is affirmed.

¶ 26    Affirmed.