2024 IL App (1st) 232141-U
No. 1-23-2141
Order filed May 10, 2024

Sixth Division

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except for the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* THE INTEREST OF N.W., a Minor. | ) | Appeal from the |
| | ) | Circuit Court of |
| (THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | No. 18 JA 918 |
| | ) | |
| v. | ) | |
| | ) | Honorable |
| M.W., | ) | Shannon P. O'Malley, |
| | ) | Judge, presiding. |
| Respondent-Appellant). | | |

_____

JUSTICE HYMAN delivered the judgment of the court.
Presiding Justice Johnson and Justice Tailor concurred in the judgment.

**ORDER**

¶ 1        *Held*: The trial court's finding that mother was unfit by failing (i) to maintain a reasonable degree of responsibility for minor child and (ii) to make reasonable progress toward reunification was not against the manifest weight of the evidence.

¶ 2        M.W. appeals after the trial court terminated her parental rights to her six-year-old son, N.W. The trial court found M.W. unfit for (i) deserting her son for more than three months before the termination proceeding began (750 ILCS 50/1(D)(c) (West 2022)); (ii) failing to maintain a reasonable degree of interest, concern, or responsibility in his welfare (750 ILCS 50/1(D)(b) (West 2022)); (iii) failing to make reasonable efforts to correct the conditions that

caused his removal (750 ILCS 50/1(D)(m) (West 2022)); and (iv) failing to make reasonable progress toward her son's return within 12 months of being adjudicated dependent (750 ILCS 50/1(D)(m) (West 2022)). The trial court then found it in N.W.'s best interest to terminate M.W.'s parental rights and M.W.'s father, with whom N.W. had resided for six years, adopt him.

¶ 3    M.W. appealed the trial court's unfitness finding, arguing it was against the manifest weight of the evidence because the State failed to (i) allege she deserted N.W., (ii) prove she did not maintain a reasonable degree of responsibility in his welfare, and (iii) prove she did not make reasonable progress toward N.W.'s return home.

¶ 4    Regardless of whether M.W. deserted N.W., the trial court's findings that she failed to maintain a reasonable degree of responsibility for N.W. or make reasonable progress for his return home were not against the manifest weight of the evidence. So, we affirm.

¶ 5                                    Background

¶ 6    N.W. was born on August 18, 2018. The State filed a petition to adjudicate wardship and temporary custody a month later. The petition listed M.W. as the mother and the father as unknown. Potential putative fathers were never located and are not parties to this appeal. M.W.'s mother, R.J., is named on the petition as she is M.W.'s legal guardian.

¶ 7    The petition alleged neglect of N.W. due to an injurious environment, abuse by being placed at a substantial risk of injury, and dependence without proper care because of his mother's physical or mental disability. The allegations were predicated on M.W.'s mental health issues and reports of domestic violence between M.W. and her mother. M.W. had been psychiatrically hospitalized and had a diagnosis of schizoaffective disorder. After a hearing,

the trial court gave the DCFS Guardianship Administrator temporary custody of N.W. and placed him with his maternal grandfather, D.W., where he still resides.

¶ 8        On March 7, 2019, the trial court found N.W. neglected due to an injurious environment and dependent due to M.W.'s inability to care for him. The court held an immediate dispositional hearing and entered an order adjudging N.W. a ward of the court. The court found that (i) M.W. and R.J. were unable to care for N.W., (ii) reasonable efforts had been made to prevent his removal, and (iii) appropriate services aimed at family preservation had been unsuccessful. The court terminated temporary custody and placed N.W. under DCFS guardianship.

¶ 9        After an initial permanency planning hearing, the trial court entered a goal of return home pending status. The permanency order's recommended reunification services included individual therapy, a Nurturing Parenting Program (NPP), psychiatric services, and substance abuse treatment.

¶ 10       After the second permanency hearing, the court entered a goal of return home within 12 months but ordered the agency to engage in concurrent planning for goals other than return home. The permanency order stated that M.W. needed parenting classes and to visit a Community Integrated Living Arrangement (CILA). The court found that M.W. had not made substantial progress toward N.W.'s return home.

¶ 11       On December 3, 2020, service provider Human Resources Development Institute, Inc. ("HRDI") issued a report stating M.W. (i) completed a re-assessment of her IM-CANS2, "Illinois Medicaid Comprehensive Assessment of Needs and Strengths;" (ii) had a diagnosis of schizoaffective disorder; (iii) had been engaging in weekly therapy sessions; (iv) had been

taking prescribed medications and attended all psychiatric appointments; and (v) undertook a substance abuse assessment and completed the treatment plan.

¶ 12     After a permanency hearing in June 2022, the trial court changed the goal to substitute care pending termination of parental rights. The permanency order noted mental health concerns that prevented M.W. from safely parenting and the willingness of M.W.'s father, D.W., N.W.'s caregiver, to provide permanency through adoption, which was in N.W.'s best interest.

¶ 13     On January 30, 2023, the State filed a supplemental petition for appointing a guardian with the right to consent to adoption (termination petition). The State alleged M.W. was unfit under sections (b) and (m) of section 50/1 of the Adoption Act for (i) failing to maintain a reasonable degree of interest, concern, or responsibility as to N.W.'s welfare (750 ILCS 50/1(b) (West 2022)) and (ii) failing to make reasonable efforts to correct the conditions that led to N.W.'s removal or failing to make reasonable progress toward his return home within any nine months after adjudication. 750 ILCS 50/1 (m) (West 2022)). The State pleaded four nine-month periods for purposes of ground (m) spanning from March 7, 2019, to March 7, 2022. The State noted that N.W. has resided with D.W. since September 14, 2018, D.W. wanted to adopt N.W., and adoption would be in N.W.'s best interest. (The State also alleged unfitness under ground (p) but later withdrew that ground).

¶ 14                                   Unfitness Hearing

¶ 15     Before the hearing, the trial court took judicial notice of the adjudication, dispositional, and permanency orders, changing the goal to termination of parental rights. The State also admitted multiple exhibits into evidence, including an integrated assessment, a parenting capacity assessment, seven service plans from 2019 to 2022, and a psychological evaluation.

¶ 16    The October 2018 Integrated Assessment (IA) detailed M.W.'s history, identified concerns, and outlined specific service recommendations for M.W. to achieve reunification with her son. M.W. was not interviewed as her whereabouts were unknown; the report was based on the assessor's review of documents. The IA described M.W.'s history of mental illness and psychiatric hospitalizations, including two hospitalizations shortly after N.W.'s birth. M.W. received diagnoses of ADHD, schizoaffective disorder, post-traumatic stress disorder, bipolar disorder, oppositional defiant disorder, impulse control disorder, anxiety, and obsessive-compulsive disorder. The IA noted that M.W. has a history of being inconsistent with her mental health services and, at times, refused treatment.

¶ 17    After discharge from a psychiatric hospital after N.W.'s birth, M.W. refused to be placed in a facility for further mental health treatment. The IA noted that M.W.'s mother, R.J., is her legal guardian and helps her with basic life skills, including transportation, organization, money management, and completing paperwork. The IA noted a history of conflict between the two, including reports from M.W. that R.J. "hit her all the time" and that M.W. had a plan to "shoot [R.J.] in the head." The assessor suggested that M.W. obtain a new legal guardian and participate in adult services.

¶ 18    Based on available reports, the assessor stated M.W. had borderline intellectual functioning and possible developmental delays and exhibited emotional impulsivity and poor judgment. The assessor recommended (i) a parenting capacity assessment to evaluate her ability to care for N.W. appropriately, (ii) a developmental disability services assessment, (iii) a psychiatric evaluation, (iv) medication management and consistency in psychiatric treatment, (v) NPP, and (vi) a substance abuse assessment followed by substance abuse services, if necessary. The assessor also recommended supervised visits in consultation with M.W.'s treatment providers.

But, should M.W. appear "unstable," the visit should end immediately, and future visits should occur only if they are in N.W.'s best interest.

¶ 19      A psychological assessment in May 2019 noted that M.W. had been in the care of at least six psychiatric facilities or hospitals from August 2018 to May 2019. The assessor recommended (i) continued monitoring of her psychotropic medication, (ii) assistance with managing daily tasks, (iii) trauma-informed therapy, (iv) NPP to increase her awareness of N.W.'s needs, (v) a referral for services for cognitively delayed adults, and (vi) a parenting capacity assessment. The psychologist opined that M.W. should not have unsupervised visits until she demonstrated an ability to responsibly parent. The assessor expressed concern M.W. lacked the "mental health, behavioral control, emotional stability or cognitive skills" to parent N.W. alone.

¶ 20      The parenting capacity assessment (PCA), completed in late 2020, reported M.W. had an IQ of 69, which ranks low. She scored with limited common sense reasoning, and her test results were "consistent with individuals who are emotionally immature, are concerned about their intellectual functioning, lack available coping skills, and who do not have emotional support."

¶ 21      The PCA noted that M.W. reported feeling competent as a parent and bonded with her son, but she had a negative view of him and a general stress response to parenting. And, she had limited parenting knowledge and developmental expectations. M.W. engaged two-year-old N.W. by talking to him, reading him a book, tickling and dancing with him, but she also appeared annoyed when he cried and failed to comfort him. At times, M.W. seemed unsure of how to interact with N.W., requiring the examiner's direction on appropriate activities.

¶ 22    The examiner concluded M.W.'s mental health issues would impact her ability to parent and expressed concern about her unstable mood and history of delusional thought patterns. Further, M.W.'s cognitive limitations would negatively impact N.W., as they affected her ability to make sound decisions and limited her understanding of appropriate activities for N.W. The examiner recommended psychiatric monitoring and therapeutic services, parent coaching, and a CILA program due to M.W.'s contentious relationship with her mother, which limited her ability to make progress in services.

¶ 23                                                    Service Plans

¶ 24    Multiple service plans were admitted into evidence. The September 2019 service plan stated that M.W. was rated unsatisfactory in individual therapy and was "not consistent with services." She participated in a substance abuse assessment but refused to comply with the recommended substance abuse services. She was referred for NPP but discharged "due to nonattendance." She saw a psychiatrist monthly, and the service plan recommended she continue with therapy to "address ongoing safety concerns."

¶ 25    M.W. had sporadic weekly visits with her son, which had to be moved from the agency office to a local library after several incidents with agency staff. She was hospitalized in September 2019 after she broke windows at her boyfriend's home. During the interview, M.W. made delusional statements and occasionally became irate. She was described as "moody, anxious, somewhat irritable, angry and then suddenly *** display euphoria" and "had difficulty following directions." M.W. continued to have auditory hallucinations, difficulty with judgment and formal reasoning, and a lack of emotional stability. She had limited ability to understand how her mental health and cognitive concerns impacted N.W. The assessor

expressed concern that M.W's limited cognitive abilities and mental health diagnoses made it difficult to use the skills that she had.

¶ 26 The March 2020 service plan stated M.W. had been hospitalized in a psychiatric ward between October and December 2019. After discharge, she lived with her mother and was compliant with psychotropic medication and mental health services. The agency recommended that she attend a CILA program as she was unable to live alone. M.W. refused to engage in recommended substance abuse services. The agency referred her for random urine drops, which she sporadically complied with. The agency attempted to refer M.W. to a NPP program beginning in June 2020, but she did not want to participate because it was online. M.W. did not complete the PCA and she did not return the assessor's calls.

¶ 27 According to the September 2020 service plan, the caseworker could not determine M.W.'s progress in therapy because the consent M.W. gave the agency to speak with the service provider had lapsed. M.W. reported she stopped engaging in therapy and attended three sessions since December 2019. Though M.W. worked with a psychiatrist and engaged in some mental health services, she did not follow all recommendations for reunification. She had been referred for services, including NPP, substance abuse, and therapy, but had not engaged in them.

¶ 28 M.W. visited with her son bi-weekly at the agency's office and occasionally in the community under the supervision of her father. During visits, M.W. was often restless and needed frequent breaks and redirection.

¶ 29 The March 2021 service plan stated that M.W. was engaged in individual therapy, psychiatric care, and medication monitoring. The agency continued to recommend adult services, specifically a CILA placement that would allow her to live separately from her

mother. She was waitlisted for NPP. Her visits with N.W. changed from in person to virtual after M.W. made abuse allegations against the agency in charge of transportation. The virtual visits continued until July 2021. Because she did not sign consents for the agency to evaluate her progress and was generally uncooperative, the agency deemed her progress unsatisfactory.

¶ 30    The August 2021 service plan noted that M.W. had been entered on a waiting list for the National Youth Advocate Program (NYAP), a DCFS service provider. She had completed all recommended services except the NPP, for which she was still waitlisted. The plan recommended she continue participating in individual services for mental health needs.

¶ 31    The February 2022 service plan noted that M.W. still lived with her mother despite recommendations to the contrary. The agency continued to discuss adult services and placement, but M.W. was not interested in going to a CILA. M.W. and her mother agreed to begin family therapy, but the agency remained concerned about physical and verbal altercations, including an argument during a child and family team meeting.

¶ 32    M.W. refused to commit to adult services to address her cognitive limitations. She attended NPP between August 2021 and February 2022, but the final class ended when she argued with agency staff. She also failed to complete homework necessary for successful discharge.

¶ 33    The final service plan from September 2022 noted the hospitalization of M.W. She had been in therapy at the Community Counseling Center of Chicago (C4) but then discharged for lack of attendance. C4 recommended therapy through another agency, but M.W. did not follow up. M.W. had not contacted her case worker to schedule visits with N.W. since April 2022.

¶ 34                                    Caseworker Testimony

¶ 35    Sukman Wong, a NYAP case management supervisor, testified that N.W. was transferred in January 2021 from a different agency after M.W. and her mother displayed aggressive

behavior toward staff. Wong said M.W.'s mother created obstacles in referring M.W. for services by refusing consent or delaying the return of documentation. NYAP learned from the prior agency that M.W. hadn't been consistent in her reunification services and was mentally unstable from September 2020 to January 2021. Based on the IA and other documentation, NYAP determined that M.W. needed individual therapy, psychiatric medication monitoring, substance abuse treatment, and NPP. Wong also recommended a CILA placement.

¶ 36    Wong testified that the agency took M.W.'s psychiatric diagnoses and intellectual disability into account when communicating with her and her mother about services, and she and her team had quarterly meetings with M.W. to ensure she understood the services required for reunification. M.W. successfully completed therapy at HRDI and transitioned to C4, which provides a lower level of treatment for patients whose mental health issues have become less severe. According to C4, M.W. was at the beginning stages of treatment, had made minimal progress on her treatment goals, and "lacks insight surrounding her case with DCFS." C4 discharged M.W. because she stopped attending therapy when the goal changed to termination of parental rights. C4 recommended that M.W. attend therapy with a different mental health provider but she did not.

¶ 37    According to Wong, as of October 2021, M.W. took multiple psychotropic medications, but after M.W. stopped attending therapy, the agency was unable to confirm her compliance with her medication or assess her mental health. In addition, the family services plans indicated M.W. was "unsatisfactory" in progressing toward N.W.'s return home, showing minimum progress in individual therapy, missed appointments, and an incomplete NPP. Wong observed M.W. with N.W. in March 2022 and concluded that M.W. was behaving inappropriately or not applying what she learned at NPP. NYAP recommended supervised contact with N.W. because

of her limited mental capacity and severe mental health, which prevented her from providing a proper and safe environment.

¶ 38     On cross-examination by the guardian *ad litem*, Wong said M.W. sometimes became argumentative with agency staff but not aggressive. M.W. had supervised visits with N.W. at the agency's office. The last visit was in March 2022. After the staff told her the goal might change to terminating her parental rights, M.W. became upset and terminated the visit. She also stopped attending therapy. Wong's agency never recommended N.W. return home.

¶ 39     On cross-examination by M.W.'s attorney, Wong acknowledged M.W. had completed outpatient substance abuse treatment and attended every NPP session until the final observation session, which a caseworker terminated after getting into a disagreement with M.W. Wong agreed M.W. visited with N.W. twice a month between March 2021 and March 2022 but had not visited him since and communicates with him only when he calls her.

¶ 40     Wong agreed that M.W.'s visits with N.W. had some good moments; at times, they danced, sang, played games, and had fun. But opined that N.W. should not be left alone with M.W., "[b]ecause of [her] mental capacity and her dysregulation and emotions, from my experience, I will not leave a child alone with her, any child, because she would not be able to make sure the child is safe and properly supervised."

¶ 41     Marcia Merrill, a NYAP caseworker, was assigned to N.W.'s case in August 2021. Merrill supervised more than 13 in-person visits and observed M.W. being aggressive toward N.W., particularly during potty training. She expressed concern that M.W. gave N.W. too much gum and food during visits. M.W. brought food to visits even though she was advised not to do so and made N.W. eat when he didn't want to. Merrill said some visits were appropriate, although M.W.'s conduct included aggressively pushing N.W. down into a chair.

¶ 42    Merrill attended M.W.'s final NPP session in March 2022, which involved M.W. visiting with N.W. in person while an NPP staff member observed via Zoom. According to Merrill, she admonished M.W. for giving N.W. too much gum, and M.W. got angry and told her to "shut up and stop talking to her." Merrill said she felt unsafe for herself and N.W., so she informed the observer she was ending the session. M.W. left "really angry." As a result, M.W. did not successfully complete NPP. Also, she had no in-person visits with N.W. since.

¶ 43    After resting, the State argued that M.W. was unfit under statutory grounds (b), (c), (m), and (n). As to ground (c), M.W.'s last visit with N.W. was in March 2022, more than three months from the termination hearing. As to grounds (b) and (m), M.W. had not made progress towards the goal of unsupervised day visits or return home because of her intellectual disability and mental health issues. The State also argued the court should find on ground (b) that the mother did not act responsibly, as she had not made progress in services.

¶ 44    The GAL argued the State met its burden on all grounds pleaded, particularly ground (c), based on testimony that M.W. had not visited N.W. since March 2022. As to ground (m), the GAL argued the State met its burden "for progress and efforts, but certainly more pronounced with respect to progress" throughout the relevant periods. Also, M.W. made no progress towards the goal of reunification because Wong and Merrill never "felt comfortable with [M.W.] having unsupervised contact with [N.W.]." Regarding ground (b), the GAL conceded that M.W. "had an interest in [N.W.]" but failed to make progress in reunification services.

¶ 45    M.W.'s attorney argued the evidence established that M.W. attended therapy for over two years and had completed many services before the goal changed to termination, and the agency would no longer pay for services. As to her inability to parent, as concluded by the agency,

M.W. may not have received referrals for appropriate therapy: the record shows a recommendation for individual supportive therapy dealing with psychological trauma, but nothing indicates the agency issued a referral. He asserted the record shows a gentle, loving interaction between M.W. and N.W. during a supervised visit and argued that "there is potential for parenting [here]."

¶ 46    The State conceded in rebuttal that "mom has interest, concern." Still, it reiterated she lacks responsibility, which supports unfitness on ground (b), because she failed to make progress in services, which in turn supports unfitness on ground (m). The State also conceded that M.W. became disillusioned with continuing therapy once the goal changed but asserted the agency did not withdraw access to therapy or other services; M.W. simply stopped attending.

¶ 47    After arguments, the trial found the state met its burden by clear and convincing evidence to show M.W. was unfit to parent N.W. on statutory grounds (b), (c) and (m). The court also found Wong and Merrill "extremely credible."

¶ 48                    Best Interest Hearing

¶ 49    The trial court then proceeded to a best interest hearing. The State recalled Marcia Merrill, who testified that N.W. had been residing with his maternal grandfather, D.W., since September 2018. D.W. and his wife were about 65 years old. Merrill visited the foster home twice a month and never observed physical impairments that would prevent the couple from parenting N.W. A family friend agreed to be a backup caregiver. The foster parents receive respite care through the agency if N.W. is in foster care, even after M.W.'s parental rights terminate. D.W. and his wife were becoming licensed foster parents.

¶ 50 Merrill has never seen signs of abuse, neglect, or corporal punishment or other indications that D.W.'s home was inappropriate for N.W. Furthermore, N.W. gets along well with D.W.'s wife and calls her "grandma" and D.W. "grandpa." She has observed a bond between N.W. and his foster parents. Their relationship is compassionate, loving, and nurturing. Merrill opined that termination of M.W.'s parental rights and for him to be adopted was in N.W.'s best interest. D.W. and his wife love N. M. and want to adopt him.

¶ 51 N.W. had recently been diagnosed with autism and ADHD and needs medication. He takes his psychotropic medication, attends kindergarten, and has an IEP to address a developmental delay. He receives occupational therapy and therapeutic services to help his behaviors in the foster home and may get speech therapy.

¶ 52 After closing arguments, the trial court ruled the State met its burden by a preponderance of the evidence that termination of M.W.'s parental rights was in N.W.'s best interest. The court found Merrill's testimony credible and noted that N.W. had resided with D.W. and his wife since 2018, and they provided a loving and stable home.

¶ 53                                    Analysis

¶ 54 The Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq*. (West 2022)) provides for the termination of parental rights in a two-step process. "First, there must be a showing, based on clear and convincing evidence, that the parent is 'unfit,' as that term is defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022))." *In re C.W.*, 199 Ill. 2d 198, 210 (2002). After finding the parent unfit, the court next considers whether it is in the child's best interests to terminate parental rights. *Id.* The State must prove by a preponderance of the evidence that termination is in the child's best interests. *In re D.T.*, 212 Ill. 2d 347, 366 (2004).

¶ 55    M.W. challenges the unfitness finding only and does not ask us to review the finding terminating her parental rights. Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2022) (points not argued on appeal are waived).

¶ 56                                   Standard of Review

¶ 57    We give great deference to the trial court's unfitness finding and reverse where that finding is against the manifest weight of the evidence. *In re Nicholas C*., 2017 IL App (1st) 162101, ¶ 24. Against the manifest weight of the evidence means the opposite conclusion is plainly evident or where the finding is unreasonable, arbitrary, or not based on the evidence. *In re Shauntae P.*, 2012 IL App (1st) 112280, ¶ 89. Because of the delicacy and difficulty of child custody cases, an "even deeper deference is given to the trial judge than under the familiar manifest weight of the evidence standard." *S.K.B.*, 2015 IL App (1st) 151249, ¶ 28.

¶ 58    We also give deference to the trial court's credibility determinations as it is in the best position to observe the conduct and demeanor of the parties and witnesses and has a degree of familiarity with the evidence that a reviewing court cannot possibly obtain. *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002). We will not substitute our judgment for the trial court's regarding the credibility of witnesses, the weight given to the evidence, or inferences drawn from the evidence. *Id*. at 499.

¶ 59                                       Desertion

¶ 60    M.W. contends the trial court erred in finding she was unfit on ground (c), which provides for a finding of unfitness for "desertion of the child for more than three months next preceding the commencement of the Adoption proceeding." 750 ILCS 50/1(D)(c). M.W. notes the State's termination petition alleged she was unfit under grounds (b), (m), and (p) (which was later

withdrawn) but did not allege ground (c). M.W. argues a termination petition must contain the specific statutory grounds for charging unfitness (*In re D.C.*, 209 Ill. 2d 287, 295 (2004)) and that a court may not terminate on grounds not charged. *Id*. at 296. Moreover, M.W. contends that the State failed to present clear and convincing evidence she deserted N.W. in the three months before the termination hearing, so that finding should be reversed. *Id*. at 295, 296.

¶ 61    The State argues that M.W. waived the issue by not objecting in the trial court. Alternatively, the State contends the evidence suffices to affirm on ground (c) because M.W. (i) did not visit N.W. from March 2022 until the date of the termination hearing, which exceeded three months, and (ii) failed to participate in necessary reunification services during that period.

¶ 62    Unfitness determination proceedings are civil in nature. 750 ILCS 50/20 (West 2014). Although the plain error rule applies to criminal cases, on rare occasions, plain error is applied in civil cases. *Wilbourn v. Cavalenes*, 398 Ill. App. 3d 837, 856 (2010). Also, waiver is a limitation on the parties, not on the court. *Jackson v. Board of Election Commissioners*, 2012 IL 111928, ¶ 33. Therefore, reviewing courts may consider waived issues to achieve a just result or maintain a sound and uniform body of precedent. *Id*. We choose to consider the issue in the interest of justice.

¶ 63    The Public Guardian agrees with M.W. that because the State's termination petition did not allege M.W. was unfit under ground (c) the trial court's unfitness finding as to that ground cannot stand. The Public Guardian also agrees that M.W. did not desert N.W. for more than three months before the termination hearing because she attempted reunification services and had occasional virtual contact with N.W. in December 2022, less than three months before the State filed the termination petition. Further, M.W. asked her attorney to contest the termination of her parental rights, negating the intent required under ground (c).

¶ 64          Nonetheless, the Public Guardian asserts that although the trial court erred in finding M.W. unfit based on ground (c), we should affirm the unfitness findings under grounds (b) and (m), which were not against the manifest weight of the evidence. We agree. When, as here, the court makes findings under several grounds, we need to find at least one is appropriate to affirm the finding of unfitness, regardless of findings on the others. *In re Y.F.*, 2023 IL App (1st) 221216, ¶ 47; *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006).

¶ 65                               Reasonable Degree of Interest, Concern, and Responsibility

¶ 66          A trial court may find a parent unfit under ground (b) if he or she fails to "maintain a reasonable degree of interest, concern or responsibility" in the welfare of their child. 750 ILCS 50/1(D)(b) (West 2022). The language of ground (b) is disjunctive, meaning that failing to maintain a reasonable degree of any of the elements may be considered on its own as a basis to declare a parent unfit. *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24. This analysis does not focus on the parent's success but rather the reasonableness of efforts. *Id.* But simply demonstrating some interest or affection toward a child does not make a parent fit or make their efforts reasonable. *Id.*; *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004).

¶ 67          When analyzing a parent showing reasonable concern, interest, or responsibility in a child's welfare, we "examine the parent's conduct concerning the child in the context of the circumstances in which that conduct occurred." *In re Adoption of Syck*, 138 Ill. 2d 255, 278 (1990). A court considers the parent's difficulty in obtaining transportation to the child's residence, the parent's poverty, actions or statements that hinder or discourage visitation, and whether failure to visit was motivated by a need to cope with other aspects of life or an indication of true indifference to, and a lack of concern for, the child. *Id.* at 279. A parent's

circumstances, such as an intellectual disability, do not necessarily or automatically redeem a failure to demonstrate reasonable interest, concern, or responsibility. Nor do these circumstances fix a different standard of reasonableness. Instead, the question becomes whether a parent's then-existing circumstances provide a valid excuse. *In re M.I.*, 2016 IL 120232, ¶ 29. "A parent need not be at fault to be unfit." *In re E.O.*, 311 Ill. App. 3d 720, 727 (2000).

¶ 68    M.W. contends the State conceded she was interested in and concerned for N.W. and relied solely on the reasonable responsibility prong of ground (b). But the trial court did not rule on whether she acted responsibly, stating she had not shown interest and concern because she had not visited N.W. between March 2022 and October 2023, when the termination hearing commenced. M.W. further asserts the evidence does not support a finding that she failed to act responsibly towards N.W. given she completed most recommended services until she got into a dispute with the caseworker at the final NPP session in March 2022, after which in-person visits ceased, but she continued to have phone contact with N.W. She argues she has consistently tried to become mentally capable of independently parenting and although she had not yet succeeded, her efforts were reasonable under the circumstances.

¶ 69    The parties concede M.W. cares for and loves N.W. But interest in or affection for a child alone does not render a parent fit. *In re E.O.*, 311 Ill. App. 3d at 727. M.W. focuses on the March 2022 incident, but since the case came into the system, she has had difficulty complying with service plans and maintaining visitation sufficient to support a finding of unfitness. *In re Jaron Z.*, 348 Ill. App. 3d at 259.

¶ 70        The record shows M.W. initially visited with N.W. regularly but stopped all visits after March 2022. She then occasionally spoke with N.W. on the phone when he called her, but the evidence did not show she regularly called him, sent gifts, cards, or letters, or otherwise tried communicating with him while he lived with her father.

¶ 71        Besides the visitation issues, seven consecutive service plans rated M.W. unsatisfactory between September 2019 and September 2022. Further, M.W. failed to deal with her mental health issues adequately. She initially attended individual therapy but then refused to attend after she was transferred to C4. As noted, M.W. took multiple psychotropic medications, but once she stopped attending therapy, the agency could not confirm her compliance to ensure she could properly supervise N.W. This supports a finding of unfitness under ground (b). See *In re M.J.,* 314 Ill. App. 3d 649, 656 (2000) (despite consistent visits with her child, mother was unfit where she failed to substantially comply with service plan directives that included participation in mental health services). Moreover, M.W. refused to consider a recommended CILA program, which would have allowed her to live independently from her mother, with whom she had an abusive relationship, indicating an inability to take responsibility for progressing toward N.W. returning home.

¶ 72        As noted, M.W. was unable to successfully complete NPP after getting into a dispute during the final observation session. Moreover, her conduct during visits with N.W., including feeding him too much food, forcing him aggressively into a chair, and being verbally aggressive with the agency staff members, indicates she had not incorporated the parenting techniques she learned. At no point was M.W. able to have unsupervised visits with N.W., as the caseworkers believed it would not be safe.

¶ 73    Although the trial court did not make a specific finding that she failed to maintain a reasonable degree of responsibility, we may affirm the finding of unfitness on any basis, regardless of whether the trial court relied on that basis or whether the trial court's reasoning was correct. *In re Zoey L.*, 2021 IL App (1st) 210063, ¶ 34. The evidence in the record established M.W.'s failure to maintain a reasonable degree of responsibility as to N.W.'s welfare, which is sufficient to affirm the unfitness finding under section 1(D)(b) of the Adoption Act. 750 ILCS 50/1(D)(b) (West 2022).

¶ 74                        Reasonable Progress Toward Reunification

¶ 75    Reasonable efforts and reasonable progress are distinct grounds for a finding of unfitness under section 1(D) (m) of the Adoption Act. *In re Jacorey*, 2012 IL App (1st) 113427, ¶ 21. A parent is considered unfit if they fail to make either (i) a reasonable effort to correct the conditions that led to the child's removal or (ii) reasonable progress toward the child's return home within nine months after the adjudication of neglect. *In re R.L.*, 352 Ill. App. 3d 985, 998 (2004); 750 ILCS 50/1(D)(m) (West 2022).

¶ 76    Although the State's termination petition alleged M.W. failed both to make reasonable efforts to correct the conditions that led to N.W.'s removal and reasonable progress toward his return home, the trial court's unfitness finding addressed reasonable progress, not reasonable efforts. The State's brief also focuses solely on reasonable progress. So, we do as well.

¶ 77    The benchmark for measuring a parent's progress toward the return of the child under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with service plans and court's directives in light of the conditions that gave rise to the child's removal, and other conditions that later became known and would prevent returning the child to the parent. *In re*

*C.N.*, 196 Ill.2d 181, 216-17 (2001). Compliance with service plans alone, however, is insufficient. Reasonable progress exists when the trial court can conclude that it will be able to order the child returned to parental custody in the near future. *In re Daphnie E.*, 368 Ill. App. 3d at 1067. An objective standard applies to determining a failure to make reasonable progress. The trial court focuses on the amount of progress toward reunification that could be reasonably expected under the circumstances. *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31.

¶ 78        We find no basis in the record to conclude the trial court's decision was against the manifest weight of the evidence. M.W. argues she made reasonable progress because she completed some services in each of the four nine-month periods. But, as noted, her progress was rated as unsatisfactory on seven consecutive service plans. Although M.W. complied with some recommended services, including completing a substance abuse assessment and treatment, she failed to complete NPP and engaged in therapy sporadically. Also, she refused to participate in adult services or consider moving to a CILA, as recommended, due to her volatile relationship with her mother.

¶ 79        Moreover, service plans aside, M.W. never made sufficient progress so N.W. could be returned to her custody in the near future. *In re Daphnie E.*, 368 Ill. App. 3d at 1067. Wong testified that M.W. should not be left alone with her son because she was unable to ensure the child's safety. M.W.'s insufficient progress supports the trial court's finding she was unfit under section 1(D)(m) (ii) of the Adoption Act.

¶ 80        Affirmed.